## STEPTOE LIVE STOCK CO. *v.* GULLEY ET AL.

No. 2895

February 4, 1931.                                   295 P. 772.

(SANDERS, J., dissenting.)

*Morley Griswold, Milton J. Reinhart* and *H. U. Castle,* for Appellants:

*Milton'E. Badt* and *James Dysart,* for Respondents:

*Brown & Belford* and *Guy V. Shoup,* Amici Curiæ:

*Chandler & Quayle*, Amici Curiæ:

*V. H. Vargas,* Amicus Curiæ:

## OPINION

By the Court, COLEMAN, C. J.:

This is an appeal from an order denying a motion to dissolve an injunction pendente lite.

The complaint, after alleging the corporate existence of the plaintiff, avers that for more than forty years last past it and its predecessors have been and now are the owners of the waters of Canyon creek, Stag Spring creek and Cottonwood creek, and of the forks and branches thereof, situated in Elko County, both for irrigation purposes and for the watering of live stock; that all of the waters of said creeks are necessary and for over forty years have been necessary for the watering of the live stock of plaintiff and its predecessors; that for more than forty years the plaintiff and its predecessors, by means of dams, ditches, and canals, have diverted and used all of the waters of said creeks and watercourses for the irrigation of their lands, and that the live stock so watered comprise more than 500 head of live stock; that plaintiff is now watering their live stock upon said watercourses in sufficient number to utilize substantially all that portion of the public range

accessible to live stock watering upon said streams; that in May, 1929, the defendants, in disregard of the rights of the plaintiff, and without its consent, watered approximately 2,000 head of sheep upon said creeks, upon the public domain, without the consent and against the wishes of the plaintiff, so as to deprive plaintiff of the grazing uses of said public domain, and substantially interfered with and impaired the value of such grazing use and of such water right; that defendants threaten to continue to commit and perform the acts complained of unless restrained. Upon the filing of the complaint the court entered a show cause order and an injunction pending a hearing thereupon.

In due time the defendants appeared and moved a dissolution of the temporary injunction. Upon the hearing testimony was taken, after which the order denying the motion was entered.

Incident to making the order granting an injunction pendente lite the court made specific findings of facts. It found, inter alia, that for more than forty years last past the plaintiff and its predecessors in interest have had and now have a subsisting right to water in excess of 500 head of live stock at and upon the water courses in question, and have watered their live stock in sufficient numbers to utilize substantially all that portion of the public range available to livestock watering at such places; that said watering places on said watercourses are natural watering places formed by natural depressions and by the making of cattle trails into such particular watering places on said watercourses; that said watering places on said watercourses could not have been and could not be improved by the construction of dams, ditches, pipe lines, troughs, or other artificial means; that the use of said waters and range by such live stock of the plaintiff and its predecessors during said period was exclusive, except as to other live stock that would drift or stray in, and that said right on the part of the plaintiff to water their said live stock in sufficient numbers to utilize substantially all that portion of the public range readily available to livestock

watering at said places was recognized by other owners of live stock whose stock drifted or strayed to such places.

The evidence taken upon the hearing of the motion to dissolve the temporary injunction failed to show that any dam, ditch, reservoir, or other artificial means was used by the plaintiff, or its predecessors in interest, by way of appropriation of the waters in question for the watering of stock.

Counsel for appellant state in their opening brief: "This appeal is upon the sole question of whether or not mechanical means are necessary to appropriate water for stock-watering purposes. The plaintiff and respondent maintain that no mechanical means are necessary to appropriate water for live stock; that the turning of cattle upon the public domain, adjacent to a stream system constitutes the mechanical means of appropriation. The defendants and appellants maintain that in order to appropriate water, it is necessary that some mechanical means be installed; that the mere turning of live stock upon the public domain does not constitute such act or acts as will constitute an appropriation."

■ In support of this statement, which considerably narrows our labors, counsel assert that the case of Walsh v. Wallace, 26 Nev. 299, 67 P. 914, 99 Am. St. Rep. 692, is decisive of the point. During the oral argument one of the members of the court intimated that it was his opinion that no point was suggested in that case which throws any light upon the question before us. Counsel for appellant thereupon suggested that the point was urged in the petition for a rehearing. We have read the petition for rehearing in that case and find nothing in it justifying counsel's conclusion; however, if it were thus raised, we have consistently held in a long line of decisions that a point made for the first time on petition for a rehearing would not be considered. At any rate the point was not decided in the case.

Nevada is the sixth state in area in the Union, and,

though some of our eastern sister states count their population by the millions, as does our sister state to the west, we have a mere handful, less than 100,000 inhabitants, notwithstanding the fact that our mines have produced fabulous wealth, and from time to time have been the Mecca of soldiers of fortune of the civilized world.

That such an immense territory supports only a mere handful of people would seem unbelievable to a stranger did he not know that this state, so far as rainfall is concerned, is arid, instead of semiarid, as is sometimes said of it. When this condition is appreciated and that one may, in sections, travel for hours without seeing a stream of water, it can readily be understood why our population is so small. And when, in addition, it is known that the livestock industry is our second, if not first, most stable industry, it can be fully appreciated why the little water which we have is almost as priceless as rubies. In this situation it was but natural that the people, from the very earliest territorial period, should put the available water to some beneficial use. This they did for many years without statutory or constitutional direction as to the manner of so doing, and, though statutes were finally adopted specifying the manner whereby water might be appropriated, it was subsequent to the date of the alleged appropriation relied upon by the plaintiff, and hence cannot influence the determination of this case.

From the arrival of the earliest settler on the Pacific Coast from the east as a result of the gold discoveries in 1849, the right to appropriate running water was recognized by the people and was upheld at a very early date by the supreme court of California in the case of Irwin v. Phillips, 5 Cal. 140, 63 Am. Dec. 113, in which the court observed that courts are bound to take notice of the conditions of the country which they judicially rule. The right to appropriate the public waters of Nevada was recognized in this state in the early cases of Lobdell v. Simpson et al., 2 Nev. 274, 90 Am. Dec. 537; Ophir S. M. Co. v. Carpenter, 4 Nev.

534, 97 Am. Dec. 550; Covington v. Becker, 5 Nev. 281; Barnes v. Sabron, 10 Nev. 217. And in Walsh v. Wallace, 26 Nev. 299, 67 P. 914, 99 Am. St. Rep 692, this court recognized a vested right to water appropriated in territorial days. While it was held in Vansickle v. Haines, 7 Nev. 249, that the doctrine of riparian rights prevailed in this state, the rule thus enunciated was never fully accepted and was finally unequivocally overruled in the case of Reno Smelting, Milling & Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364. While the right to thus appropriate the public waters of Nevada was recognized from the very earliest days, no specific method of appropriation was ever declared to be necessary, other than by putting it to an economical beneficial use, except as was the customary practice, and, since it was the custom in those days to build dams and ditches to divert the waters of streams for agricultural, milling, mining, and fluming, it is insisted that in prestatutory days it was necessary to use some mechanical method of diverting water by way of appropriation for the watering of live stock. We are unable to follow this line of reasoning, for at least two reasons. First, all the cases cited to support the contention, except as hereinafter noted, are cases pertaining to the appropriation of water for irrigation purposes, and, while all of those cases are founded upon a recognized custom, proponents of the rule are willing to overthrow a custom just as long standing and well established as to watering live stock. All of the authorities hold that no one can appropriate for irrigation purposes more water than he can put to a beneficial use, and this element would naturally lead to a repudiation of the contention asserted by respondents in Walsh v. Wallace, supra, under the facts of the case. The method of diverting water from streams by the use of dams, ditches, and the like for irrigation purposes was but the natural thing to do, since water, to be put upon a tract of land, had to be taken out of the stream, and this could not be done except by some artificial structure. As this court has observed, a decision

is only an authority for what is actually decided upon a given state of facts. Jensen v. Pradere, 39 Nev. 466, 159 P. 54.

■ While it was absolutely necessary to divert water from a stream to appropriate it to agricultural uses in an economical manner, and the custom of so doing was recognized as an appropriation, it would not seem necessarily to follow that it would be necessary to do so to constitute an appropriation of the water where it could be put to a beneficial use without such diversion, where there was a practice of appropriating the waters of the streams to a beneficial use without such diversion, where it could be done just as well or better, at less cost and economically, so far as the use of the water is a factor, and, where the practice of so doing has developed into a well-established custom, we see no reason for holding that such appropriation is not valid. Suppose, for instance, that a stream flows for twenty-five miles through a deep gorge out upon a wonderfully fertile valley of large area, capable of sustaining many thousands of happy people in the State of Nevada, and just before it reaches the valley it tumbles down a fifty-foot waterfall, at which point a corporation has constructed a power plant to utilize the power available, by placing a water wheel immediately under the fall, thereby successfully utilizing the stream system, and another company, claiming that there had been no appropriation because no artificial means had been used to divert the water, undertook to divert the water from the natural stream just before it would enter the gorge, so as to convey the water to another site to be used in the operation of a hydroelectric plant, the power from which was to be used in California, would any reasonable person contend that the use by the first-named company did not constitute an appropriation? We think not.

Judge Lyman Trumbull, long an honored citizen of Illinois, in Seeley v. Peters, 5 Gilman, 142, while considering a question pertaining to the use of the public domain, when the conditions and customs were different

from what they are in Nevada, observed: "The universal understanding of all classes of the community, upon which they have acted * * * is entitled to no little consideration in determining what the law is, and we should feel inclined to so hold, independent of any statutes upon the subject." This is but one of many authorities which might be cited to sustain the view expressed. It would seem that no authority would be necessary to support such a humane rule—one pregnant with the sense of natural justice.

But we are not without authority to support the view that to constitute an appropriation where the statutes require no use of artificial means of diverting water, or where no diversion was required, that such appropriation might be made independent of both or either diversion or the use of artificial means in perfecting such appropriation. Such was the conclusion reached in Cascade Town Co. v. Empire Water & P. Co. (C. C.) 181 F. 1011, 1018. That case arose in Colorado, the constitution of which provides that the right to divert unappropriated waters of any natural stream shall never be denied. It was a case growing out of an attempt of the defendant company to divert the waters of a stream which flowed over falls, the spray from which watered vegetation within the grounds of a summer resort, thereby beautifying the same and contributing to its attractiveness and value. Judge Lewis, now of the circuit court of appeals, who decided the case, held that the use of the waters to thus irrigate the vegetation constituted an appropriation. He said: "The complainant is not required to construct ditches or artificial ways through which the water might be taken from the stream, in order that it might appropriate the same. The only indispensable requirements are that the appropriator, in order to constitute a valid appropriation, first, must intend to use the waters for a beneficial use, and second, actually apply them to a beneficial use." There was less foundation for the conclusion reached in that case than for the one we have reached in this one, since no custom was shown to exist in Colorado recognizing

the right to appropriate waters of streams under similar circumstances, whereas in this case the court below found that a well-established, well-recognized custom, of over forty years' duration, of appropriating waters in the manner shown for the watering of live stock, existed in the State of Nevada. We think that our conclusion is not only justified by such well-established custom, but that it is fortified by the act of Congress referring to streams upon the public domain, which provides that rights based upon priority of possession, which have vested and accrued and are recognized and acknowledged by local custom, shall be maintained and protected. U. S. Rev. Stats. 2339 (43 USCA, sec. 661).

Counsel for appellants call our attention to the case of Robinson v. Schoenfeld, 62 Utah, 233, 218 P. 1041, as being contrary to the conclusions reached by us. The case is not in point. In its opinion the court points out that the proof failed to show an exclusive right in plaintiff to the use of the waters in question and of the public range thereabouts. Such are not the facts in this case.

Since the argument in this case the supreme court of Utah, in Bountiful City v. De Luca, 292 P. 194, 195, has taken a position which upon casual observation might seem antagonistic to our views. However, the real question here presented was not involved, and, as we have pointed out, a case is an authority only for what it holds under the facts involved.

Counsel appearing as amicus curiæ, but in fact representing one of the railroads which traverses our state and has large holdings of land along its line, urges that, since all authorities hold that a diversion of water must be made with the intent to apply the same to a beneficial use, if the drinking by cattle constitutes a diversion, then the necessary intent must be that of the cattle, since the owner could not make the cattle drink. It is certainly true that the owner cannot make cattle drink; if he built the most expensive pipe line conceivable and the most beautiful trough that human ingenuity and skill could produce, for the cattle to drink out of, there would be no way of compelling the cattle to drink out of the

trough, instead of out of a puddle made by the overflow from the trough. No doubt it was this consideration which lead the hardy and practical livestock men of half a century ago to adopt the well and widely established custom which the court found to prevail.

It is clear to our minds that the conclusion of the trial court as to the appropriation alleged was right, and, in view of the law as enunciated in Re Calvo, 50 Nev. 125, 253 P. 671, the judgment and decree should be affirmed.

It is so ordered.

DUCKER, J.: I concur.

SANDERS, J.: I dissent.