**Roy HUNTER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20093.**

United States Court of Appeals
Ninth Circuit.

Dec. 19, 1967.

---

Butterworth & Smith, David G. Waller (argued) Los Angeles, Cal., for appellant.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis (argued) Carl L. Sandstrom, Dept. of Justice, Washington, D.C., Manuel L. Real, U.S. Atty., James R. Akers, Jr., Asst. U.S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and KOELSCH, Circuit Judges, and TAYLOR, District Judge.

KOELSCH, Circuit Judge.

The United States, complaining that Roy Hunter persistently grazed and watered his cattle within the boundaries of the Death Valley National Monument without a permit from the National Park Service, brought this suit against him in the United States District Court to secure an injunction against further trespasses.[1]

---

1. The Death Valley National Monument was duly created on February 11, 1933, by the President of the United States from unassigned lands comprising part of the public domain. Pres.Proc. No. 2028, Feb. 11, 1933, 47 Stat. 2554. Use

Hunter urged justification; in addition, he sought a declaration that he possessed water and grazing rights. He alleged that long before the monument was established his predecessors in interest continually had watered livestock, which they pastured within its present boundaries, at 26 springs and a stream therein. His theory was that this taking and use of the water constituted an appropriation vesting in his predecessors a water right, together with an appurtenant right of way to graze cattle, which rights the general government was bound to honor under the provisions of the Act of 1866, Rev.Stat. § 2339 (1875), 43 U.S.C. § 661, para. 1 (1964), *formerly* Act of July 26, 1866, ch. 262, § 9, 14 Stat. 253 (hereinafter cited as Act of 1866).[2]

The District Court found that:

"7. Prior to 1880 Wm. Lyle Hunter, grandfather and predecessor of defendant, Roy Hunter, discovered certain springs within the area now known as Death Valley National Monument, and developed said springs by diverting spring water through pipes or other conduits into tanks and troughs constructed by him for livestock watering purposes.

8. Defendant, Roy Hunter, and his predecessors in interest, his father and grandfather, have watered cattle and other livestock from the tanks and troughs adjacent to said springs and from a free flowing stream within said area, have maintained the original diversions and said use, and have grazed cattle and other livestock adjacent to said sources of water continuously since prior to 1880.

9. The watering of cattle and livestock by defendant and his predecessors in interest from the springs and from the free flowing stream within

the Death Valley National Monument constituted a beneficial use of said waters."

Despite these favorable findings, the court concluded that Hunter possessed no rights either to the waters or in the lands and granted an injunction. Hunter has appealed.

1. *The Water Right:*

"For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253 (30 USCA § 51 and note 43 USCA § 661, par. 1 and note) the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. * * * The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection * * *. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. Basey v. Gallagher, 20 Wall. 670, 683–684, 87 U.S. 670, 683–684, 22 L. Ed. 452 (1874); Atchison v. Peterson, 20 Wall. 507, 512–513, 87 U.S. 507, 512–513, 22 L.Ed. 414 (1874).

This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation of Congress by the Act of 1866, supra. Atchison v. Peterson, supra. Section 9 of that act provides that:

'Whenever, by priority of possession, rights to the use of water for mining,

---

of those lands thereupon became subject to regulations promulgated by the Secretary of the Interior pursuant to 39 Stat. 535–536 (1916), as amended, 16 U.S.C. § 3; one of those regulations prohibits "[t]he running at large, herding, driving across, or grazing of livestock * * * except where authority therefor has been granted pursuant to a revocable permit

issued by an authorized officer or employee of the National Park Service." 36 C.F.R. § 1.20.

2. In the proclamation, the President expressly declared that the removed lands remained "subject to all existing rights. * * * *" Pres.Proc. No. 2028, Feb. 11, 1933, 47 Stat. 2554.

agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches·and canals for the purposes herein specified is acknowledged and confirmed: * * *' * * * And in order to make it clear that the grantees of the United States would take their lands charged with the existing servitude, the Act of July 9, 1870, c. 235, § 17, 16 Stat. 217, 218 (30 USCA § 52 and note, 43 USCA § 661, par. 2 and note) amending the Act of 1866 provided that:

' * * * All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory.'

The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain." California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 154–155, 55 S.Ct. 725, 727, 79 L.Ed. 1356 (1935).

The trial court in the instant case concluded that " * * * no legal basis for the acquisition of an appropriation to water by virtue of local customs, laws or decisions of California has been established." We believe that the District Court misconstrued the applicable local authority and that Hunter did establish a legal basis for the acquisition of an appropriation to water by virtue of local decisions.

■ It is clear that Hunter need prove the appropriative right only by local customs, laws *or* decisions, for "[t]he union of the three conditions in any particular case is not essential to the perfection of a right by priority." Basey v. Gallagher, 20 Wall. 670, 684, 87 U.S. 670, 684, 22 L.Ed. 452 (1874). The local customs regarding proprietorship by appropriation have long since become crystalized into law by judicial decision or statute. As Mr. Weil notes in his work entitled Water Rights in the Western States, vol. 1, § 635 (3d ed. 1911):

"The local customs referred to in United States Revised Statutes, section 2339 [Act of 1866], need not be alleged or proved. * * * The principle is, as stated in Basey v. Gallagher [supra], that the rules of appropriation have everywhere in the West now passed into judicial decision or statute or both, thereby superseding the original customs on which decisions and statutes are based."

In 1872 the California Legislature enacted statutes providing for the appropriation of public waters; but the Supreme Court of that State held that the statutory method was not exclusive:

"One may by a prior actual and completed appropriation and use, without proceeding under the code, acquire a right to the water beneficially used, which will be superior and paramount to the title of one making a subsequent appropriation from the same stream in the manner provided by that statute."

Lower Tule River Ditch Co. v. Angiola Water Co., 149 Cal. 496, 499, 86 P. 1081, 1082 (1906); See also Duckworth v. Watsonville Water and Light Co., 158 Cal. 206, 211, 110 P. 927, 929–930 (1910). Thus it was not incumbent upon Hunter to establish compliance with a positive provision of California law and furthermore no statute precluded his claim.

■ Judicial authority makes the law on appropriation quite clear. Justice Field, commenting upon the declaration of the California Supreme Court in Tar-

tar v. Spring Creek Water and Mining Co., 5 Cal. 395 (1855), which announced the settled policy of the State regarding recognition of rights, added: "Ever since that decision it has been generally held throughout the Pacific States and Territories that the right to water by prior appropriation for any beneficial purpose is entitled to protection." Basey v. Gallagher, supra, 20 Wall. at 683. Moreover, Justice Field unequivocally declared: "No distinction is made in those States and Territories by the custom of miners or settlers, or by the courts, in the rights of the first appropriator from the use made of water, if the use be a beneficial one." Basey v. Gallagher, supra at 682.

■■ To constitute an appropriation, therefore, there must co-exist "the intent to take, accompanied by some open, physical demonstration of the intent, and for some valuable use." McDonald & Blackburn v. Bear River and Auburn Water and Mining Co., 13 Cal. 220, 232–233 (1859). The outward manifestation is most often evidenced by a diversion of the water from its natural source prior to the use; [Simons v. Inyo Cerro Gorda Mining & Power Co., 48 Cal.App. 524, 192 P. 144 (1920) hearing denied by California Supreme Court, 48 Cal.App. 541, 192 P. 152 (1920)] but it also can be evidenced in other ways, for example, as in this case, by watering livestock directly from the source [Steptoe Livestock Co. v. Gulley, 53 Nev. 163, 295 P. 772 (1931)] or as in other cases by placing water wheels into a stream in order to use the flowage as power to operate a mill located on the bank. Ortman v. Dixon, 13 Cal. 33 (1859); Tartar v. Spring Creek Water and Mining Co., supra.

In this case there is no lack of proof of the asserted appropriation; to the

contrary, a clearer showing could hardly be imagined. The Hunters' intent to use the water is made plain by the evidence. Year after year for nearly a century they have pastured their livestock in this isolated enclave, surrounded by miles of impassable desert; except for the water provided by these springs and the stream, there has been none other available to keep their animals alive.

Their intended (and actual) use has been for a beneficial purpose, as the trial court specifically found. Indeed a contrary finding could hardly have been justified, particularly since cattle watering has been judicially recognized in California as "a reasonable beneficial use." Rancho Santa Margarita v. Vail, 11 Cal. 2d 501, 561, 81 P.2d 533, 563 (1938).

And their use has been prior in point of time to that of any other person; indeed it appears that few people have ever ventured into this desolate area and there have never been any users other than the Hunters.

■■ We believe that a legal basis for the acquisition of an appropriation to water by virtue of local decisions has been established. On the basis of the facts found by the district court, we conclude that Hunter's predecessors must be deemed to have appropriated these waters; that the right is the equivalent of a grant of the use of the waters from the federal government; and that it is entitled to protection.[3]

2. *The Grazing Right:*

■■ Whether this "grant" carried with it an easement to graze is a question readily answered. Hunter's contention is based upon the well-settled rule that the grant of a right in real property includes all incidentals possessed by the grantee and without which the property

3. In view of its conclusion that Hunter had no water right, the district court did not determine what amount of water Hunter and his predecessors had regularly used—this being the measure of the right. The proof on this issue was fully developed by Hunter and was not controverted by the government in any par-

ticular. It showed that, although the flow of the springs and the creek fluctuated from year to year, the Hunters had always used all the water that was available from those sources. Following remand, no further proof need be taken on this issue and the trial court should shape its judgment accordingly.

granted cannot be fully enjoyed. He urges that the adjoining lands provide the means to use the water beneficially and must therefore be deemed appurtenant to it. He claims too much. The appurtenance must be limited to that which is essential to the use of the right granted; it does not include the thing with which the right granted is used. As well and succinctly said by the Colorado Court in the case of Cleary v. Skiffich, 28 Colo. 362, 373, 65 P. 59, 63 (1901), in answer to a proposition identical to the one argued by Hunter:

> "The appurtenance which could pass by virtue of a grant to a right to the use of water would be that necessary to its utilization, so that it could be applied to the purpose for which it was appropriated. The right might become appurtenant to that in connection with which it was beneficially used, but the latter could not be appurtenant to such right. It might as well be argued that, because a vested right to the use of water had been acquired for irrigation purposes, there attached to such right, as an appurtenance, land upon which to apply the water, as to say, as in this instance, there passed with the water right land in connection with which such water was utilized."

Turning to the statutory provisions, we are mindful that the Act of 1866 specifies that appurtenances shall consist of the "right of way for the construction of ditches and canals" and that its companion, the Act of 1870, Rev.Stat. § 2340 (1875), 43 U.S.C. § 661, para. 2 (1964), *formerly* Act of July 9, 1870, ch. 235, § 17, 16 Stat. 218, makes patents issued to persons other than the appropriator subject to "rights to ditches and reservoirs used in connection with such water rights * * *." These provisions are specific and there is no other language that suggests the public lands are to be encumbered by additional or other easements.

However, not being bound by the "bare words" of the provisions [Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)] we have investigated further to ascertain whether, despite this literal language, Congress meant to include a right of way such as the one claimed in this case.

Historically the general government tacitly allowed and encouraged all persons to use the open range as a public common. Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890). The provision in the Act of 1866, recognizing a right of way for ditches and canals needful to conduct appropriate water from the public domain constituted a limitation on the otherwise free use of those lands. We have found nothing to indicate that Congress intended to impose a greater limitation than those of the type specifically mentioned in the Act itself. We agree with the Eighth Circuit that:

> "None of the legislation, to which reference has been made * * * either in letter or in spirit contemplates the use of ground within the public lands for other uses and purposes * * * It is also apparent that such prior rights * * * could not extend to power houses, cottages and transmission lines as distinguished from reservoirs, dams, canals, ditches, flumes, pipes and tunnels constructed for the storing and transmission of the water itself."

Utah Light & Traction Co. v. United States, 230 F. 343, 345–346 (8th Cir. 1915).

In sum, the judgment of the district court granting the injunction was correct and is affirmed. However, we conclude that, although Hunter is not entitled to an easement to graze livestock on the lands within the boundaries of the Monument, he should be allowed a right of way over those lands to divert the water by one of the methods contemplated by the statute.[4] The

---

4. The rule is well settled that a squatter on the public domain may acquire by ap-

propriation the right to the use of water that is used by him to irrigate such land

district court was not called upon to define and fix such a right of way for Hunter made no claim in his pleadings and submitted no proof looking to the establishment of one. In short, the matter was not placed in issue.

 If we simply modify the judgment to declare Hunter's water right and affirm the portion granting the injunction, the question of right of way will remain in limbo to plague the parties and the courts.[5] Conversely, if Hunter is given the opportunity to amend his pleadings [Wiggins Ferry Co. v. Ohio & Miss. Ry., 142 U.S. 396, 413, 12 S.Ct.

188, 35 L.Ed. 1055 (1892); Blue v. Blue, 92 W.Va. 574, 116 S.E. 134, 30 A.L.R. 1169 (1922)] and assert a claim to an easement provided for by the statute, then all phases of the dispute will be finally settled by this one suit. In the circumstances of this case, we conclude the latter course is clearly the one to follow.

 The judgment is affirmed in part, modified in part, and the cause is remanded with directions to proceed as directed herein.[6]

No costs are allowed.

and that if he is evicted he may nevertheless divert the water elsewhere if he is able. Patterson v. Ryan, 37 Utah 410, 108 P. 1118 (1910); Davis v. Gale, 32 Cal. 26 (1867).

5. Ultimately, of course,. if Hunter took no action an abandonment would result. Patterson v. Ryan, 37 Utah 410, 417, 108 P. 1118, 1120 (1910).

6. Hunter also urged that in this case no basis was shown for equitable intervention; that even assuming a sufficient showing the court should not have exercised this power; and that, in any event, the injunction must be set aside for failure to "set forth the reasons for its issuance." Fed.R.Civ.P. § 65(d).
The unauthorized pasturing of cattle upon the lands within the Monument is a tort and the trespass, being wilful and continuous, is an injury for which an injunction may be granted. Mendelson v. McCable, 144 Cal. 230, 77 P. 915 (1904). It matters not that the act is made criminal for it also involves an invasion of a property right of the United States. Thus the question is not one of equitable jurisdiction but whether under the facts of this case the granting of injunctive relief constituted an abuse of the trial court's discretion. That it did not, seems manifest.
During the settlement of the Western United States it was the common practice of the immigrants and others to graze their livestock upon the public lands. The government acquiesced in this practice and,
"[t]here thus grew up a sort of implied license that these lands, thus left open, might be used so long as the government did not cancel its tacit consent. Buford v. Houtz, 133 U.S. 320, 326, 10 S.Ct. 305, 33 L.Ed. 618. Its failure to object, however, did not

confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." Light v. United States, 220 U.S. 523, 535, 31 S.Ct. 485, 487, 55 L.Ed. 570 (1911).
Although the Hunters labored long and hard and went to some expense to put in and build access roads and several shacks upon the lands incidental to their livestock operations, they did so in the knowledge that they were mere squatters and that the government could and might at any time exercise its full proprietorship and dispossess them without payment of any compensation. Osborne v. United States, 145 F.2d 892 (9th Cir. 1944).
Many years ago, this court in Shannon v. United States, 160 F. 870, 876 (9th Cir. 1908), a case similar to the present one, answered the appellant's argument that an injunction would impose a "grievous burden" upon him with this quotation from Camfield v. United States, 167 U.S. 518, 525, 17 S.Ct. 864, 42 L.Ed. 260 (1896): "the inconvenience, or even damage, to the individual proprietor does not authorize an act which is in its nature a purpresture of government lands."
In attacking the injunction as to form, Hunter appears to labor under the assumption that Fed.R.Civ.P. § 65(d) applies to the injunction itself. He is mistaken. That rule in terms relates exclusively to the "order granting an injunction" in its requirement of a statement of "the reasons for its issuance." Here the requirement was met. The order for the injunction—as distinguished from the injunction proper—is embodied in the court's Finding of Fact and Conclusion of Law and therein appear the reasons for its issuance.