# IN THE SUPREME COURT OF THE STATE OF NEVADA

RAND PROPERTIES, LLC,
Appellant,
vs.
DANIEL FILIPPINI; EDDYANN
FILIPPINI; AND JULIAN TOMERA
RANCHES, INC., BATTLE MOUNTAIN
DIVISION,
Respondents.

No. 78319

FILED

APR 09 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## ORDER AFFIRMING IN PART AND REVERSING IN PART

This is an appeal from a district court's final judgment and an award of costs in a water rights action. Eleventh Judicial District Court, Lander County; Jim C. Shirley, Judge.

### FACTS AND PROCEDURAL HISTORY

On June 7, 2011, respondent Daniel Filippini filed a quiet title action against appellant Rand Properties and respondent Julian Tomera Ranches, Inc., Battle Mountain Division (Tomera), to adjudicate conflicting claims to irrigation and stock water rights near Trout Creek. Trout Creek, located in Lander County near Blue Mountain, Nevada, travels through both public and private land. Ranchers and farmers utilize the water of Trout Creek for both irrigation and stock water purposes. Four main ranch settlements border Trout Creek: (1) Badger Ranch, owned by Filippini; (2) Roth Trout Creek Ranch; (3) Pankey Trout Creek Ranch; and (4) Dobbs Trout Creek Ranch, owned by Rand. Additionally, the four land entries relevant to this adjudication include: Roth (1869), Pankey (1872), Hughes (1871), and McBeth (1873).

Following a bench trial, the district court issued a decree and an order regarding administration of the decree. Rand appealed this decision to this court, and we reversed and remanded, concluding that the district court's insufficient factual findings precluded our review concerning Rand's and Filippini's irrigation water priority dates, Rand's, Filippini's, and Tomera's stock water priority dates, and Rand's bona fide purchaser defense in relation to ownership of certificate 12160 and the associated easement. *See Rand Props., LLC v. Filippini*, Docket No. 66933 (Order of Reversal and Remand, April 21, 2016).

On remand, the district court conducted two hearings, one of which was an evidentiary hearing. Thereafter, the district court issued an amended findings of fact, conclusions of law, and decree. In the amended decree, the district court addressed Rand's and Filippini's irrigation water priority dates, as well as Rand's, Filippini's, and Tomera's stock water priority dates. The district court further considered Rand's bona fide purchaser defense and concluded that Tomera owned stock water certificate 12160 and holds a valid easement to access the Trout Creek pipeline over Rand's property. This appeal followed.

## DISCUSSION

We review a district court's legal conclusions de novo and we "will not disturb a district court's finding of fact if they are supported by substantial evidence." *Keife v. Logan*, 119 Nev. 372, 374, 75 P.3d 357, 359 (2003). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Winchell v. Schiff*, 124 Nev. 938, 944, 193 P.3d 946, 950 (2008) (internal quotation marks omitted).

*Irrigation water priority dates*

On appeal, Rand challenges the district court's determination regarding its and Filippini's priority dates for vested irrigation water rights.

The district court concluded that Rand holds a vested claim for the irrigation of 52.5 acres[1] with a priority date of 1901 based on the Dobbs entry as opposed to the Pankey entry, which has an earlier priority date. Accordingly, it determined that Filippini holds a vested claim for the irrigation of 100 acres with a priority date of 1871 based on the Hughes entry, 16 acres with a priority date of 1872 based on the Pankey entry, and 217.6 acres with a priority date of 1873 based on the McBeth entry.

Rand argues that the district court erred when it rejected his asserted priority dates of 1869 based on the Roth entry and 1873 based on the McBeth entry. Rand also challenges the district court's finding that the Hoffman-to-Dobbs deed, which provides for a continuation of the Pankey chain of title, did not convey any claimed water rights to Dobbs, Rand's undisputed predecessor. Lastly, Rand challenges the district court's findings regarding Filippini's priority date of 1871 based on the Hughes entry.

In Nevada, the doctrine of prior appropriation determines the priority of both pre-1905 vested water rights and modern statutory water law. *Application of Filippini*, 66 Nev. 17, 22, 202 P.2d 535, 537 (1949). Appropriation requires "[a]n actual diversion of the [water], with intent to apply it to a beneficial use, followed by an application to such use within a

_____

[1]Rand originally asserted the right to use Trout Creek water to irrigate 53.8 acres of land, as opposed to 52.5 acres. Because Rand did not challenge the district court's award of 52.5 acres in its first appeal, the district court concluded that it became the law of the case, not subject to amendment. Rand does not challenge this point again on appeal and thus, we do not address this issue. *See Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (stating that issues not raised in an appellant's opening brief are waived).

reasonable time." *Id.* at 22, 202 P.2d at 537-38 (second alteration in original) (internal quotation marks omitted).

The priority of water rights is determined by the date that relates back to the appropriator's first act of appropriation, as long as the appropriator diverted the water and applied it to a beneficial use with reasonable diligence. *Irwin v. Strait*, 18 Nev. 436, 437, 4 P. 1215, 1215 (1884); *Ophir Silver Mining Co. v. Carpenter*, 4 Nev. 534, 543-44 (1868). A vested water right claimant may tack onto a predecessor's priority date by demonstrating his connection in interest to his predecessor. *See Chiatovich v. Davis*, 17 Nev. 133, 137, 28 P. 239, 240 (1882). A claimant can show his connection in interest to his predecessor by conveyance of such rights. *See id.* (considering on rehearing the rights conveyed to the appellant by prior appropriators). Otherwise, the claimant's own appropriation is considered "the inception of his right." *See id.*

*The Roth entry*

The district court determined that Pankey began a new appropriation in 1872 and did not continue the Roth chain of title, which would have established a priority date of 1869 for the water rights based on the Pankey entry. The district court reached this conclusion because Rand failed to provide a deed or tax record that showed that Roth conveyed his land and water rights to Pankey. The court found that the McWilliams mortgage was insufficient to support a conveyance between Roth and Pankey under *Hendricks v. Perkins*, 98 Nev. 246, 645 P.2d 973 (1982). Rand argues that the McWilliams mortgage, which mentions such a conveyance, satisfies *Hendricks* and thus, the district court erred when it found that Pankey did not continue Roth's chain of title.

Nevada's statute of frauds generally requires that any interest claimed in real property be in writing. *See* NRS 111.205(1). However,

Nevada law has long recognized that other evidence may sufficiently establish the existence of a deed to validly convey a property interest. *See Hendricks*, 98 Nev. at 248, 645 P.2d at 974. In *Hendricks*, we acknowledged "that a deed is the best evidence of a conveyance of property, but if testimony is admitted relating to the existence of such a deed, it cannot be said there was no evidence of a conveyance of the title to the grantee by the grantor." *Id.* In addition to proving the existence of a deed, the party must also establish the contents therein. *See id.* at 249-50, 645 P.2d at 974-75 (determining that the language in the deed defines and controls the scope of the water rights conveyed); *see also Coppermines Co. v. Comins*, 38 Nev. 359, 376, 148 P. 349, 354 (1915) (reasoning that "[p]arties usually describe in the granting clause of a deed all that they intend to convey" (internal quotation marks omitted)).

We conclude that the district court did not err in determining that Pankey did not continue Roth's chain of title. While the Pankey-to-McWilliams mortgage provides some evidence that a deed may have existed, it fails to provide the sufficient detail that *Hendricks* requires such as the transfer of any rights to Pankey or the terms and conditions of said rights. Therefore, Rand cannot assert an earlier priority date, and we thus affirm the district court's finding as to the Roth entry.

*The McBeth entry*

Rand initially argues that the district court erred when it determined that Rand failed to advocate at trial the factual theory that Rand can relate back to McBeth's entry in 1873. Rand contends that it raised its relationship to McBeth in its trial statement and through the testimony of one of its expert witnesses. We disagree. Although Rand mentioned McBeth's conveyance to Blossom in its trial statement, it did not otherwise claim a relation to McBeth's entry. Further, when testifying at

SUPREME COURT
OF
NEVADA

(O) 1947A

5

trial, Rand's expert only mentioned McBeth when describing McBeth's deed to Blossom but did not otherwise explain Rand's connection to the McBeth entry. Thus, because Rand failed to urge its connection to the McBeth entry at trial, we conclude that Rand has waived this argument on appeal. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal.").

Rand also argues that the district court erred when it found that Rand was not connected to McBeth's chain of title and that Filippini is entitled to 217.6 acres through the McBeth possession with an 1873 priority date because Filippini can only relate back to 40 acres under McBeth contained in one deed conveyance from Blossom to Hoffman. The district court provided detailed findings regarding the various conveyances, including the Blossom-to-Hoffman conveyance, and the patented land transfers that make up the 217.6 acres under the McBeth entry, all of which are supported by the record. Rand makes no arguments on appeal regarding these detailed findings. Accordingly, we affirm the district court's findings regarding the McBeth entry.

*The Pankey entry*

At issue is whether the language "enough water" in a deed to Rand's undisputed predecessor is an absolute conveyance of a property's water rights. The Hoffman-to-Dobbs deed contains the phrase *"enough water* from the said Trout Creek to irrigate the land, within these fences." (Emphasis added.) William Price, a qualified expert, testified at trial that Hoffman intended to reserve all his water rights appurtenant to the land conveyed to Dobbs in that deed. In support of his opinion, Price relied on the phrase "enough water" in the deed and contrasted it with the phrase

"all water rights," which had been used in prior deeds to convey the land and its appurtenant water rights. Based on the language in the deed and the expert's testimony, the district court found that Hoffman did not convey to Dobbs an actual vested water right, but the ability to perfect a water right, through beneficial use, for 16 acres.

We disagree. The right to "enough water" to irrigate the conveyed land is without a durational limit or caveat based on the availability of water. Such broad language creating a perpetual obligation to provide water has the practical effect of a water-right conveyance. *See Smith v. Willis*, 163 P. 810, 814 (Or. 1917) ("The agreement to furnish the water, the deed conveying the land, and the mortgage were all parts of the same transaction, and it is specified in the contract, which is executed with all the formalities attending a conveyance of real property, that the right therein conveyed shall be perpetual. The water right thereby became an appurtenance to the land, and as such a part of the realty."). Courts from neighboring jurisdictions consider and treat such perpetual contractual obligations to provide water as water rights. *See id.*; *see also Nampa & Meridian Irr. Dist. v. Gess*, 106 P. 993, 995 (Idaho 1910) (recognizing that a contractual right to water use may be treated as a perpetual water right when there is sufficient consideration).

Notably, while Price testified that Hoffman intended to reserve the water rights appurtenant to the land he sold to Dobbs, the deed does not include language indicating an express reservation of water rights. Moreover, Price's testimony indicates that Dobbs's purpose in buying the land from Hoffman was to obtain the water rights that went with the land because without the water rights the land would have been worthless. Thus, we conclude that the district court erred when it found that Hoffman

did not convey to Dobbs an actual vested water right under the Pankey entry because the Hoffman-to-Dobbs deed conveyed the 16 acres of vested water rights appurtenant to the land.

*The Hughes entry*

Regarding the Hughes chain of title, which presented a similar missing-deed issue as the Roth entry, the district court found that sufficient evidence demonstrated continuity of title. The district court relied on expert testimony that a chain of title can be evidenced through the tax records once a possessory right is established. Rand argues that the district court erred because there is no evidence that during the break in chain from 1891 to 1897, the water rights appurtenant to the land were continuously used for a beneficial purpose.

We decline to disturb the district court's finding that there likely was continued use of the Hughes water rights despite an intervening ownership by the county for non-payment of taxes based on the property's inclusion in the Rufli probate. There is adequate evidence in the record for a reasonable mind to infer that for the land to have been included in probate, it must have been valuable, and in turn, for the land to have been considered valuable, it must have been in continuous beneficial use. Additionally, county possession of real property does not break a chain of title. *See* 1891 Nev. Stat., ch. XCIX, § 40, at 148 (detailing that when the Treasurer purchases real property at a tax sale "the title thereto shall vest in the county for the benefit of the county and State"). Thus, we affirm the district court's finding as to the Hughes entry.

Therefore, regarding the water irrigation rights, we reverse the district court's amended findings of fact, conclusions of law, and decree regarding the Pankey entry and conclude that Rand has a vested claim of 52.5 acres, 16 of which are entitled to a priority date of 1872 based on

Pankey's entry and the remaining 36.5 acres have a priority date of 1901 based on Dobbs's entry.[2] We affirm the district court's findings on Roth entry, the Hughes entry, and the McBeth entry.

*The stock water priority dates for Rand, Filippini, and Tomera*

Rand also challenges the district court's determination regarding each of the party's stock water priority dates. The district court found that each party holds an 1862 priority date for stock watering originating with J.R. Bradley's possession, which began in 1862 in the Badger Meadows. The district court relied on each party's respective grazing permit as issued by the U.S. Department of the Interior, Bureau of Land Management (BLM) to adjudicate the scope of the vested stock water right.[3] Rand argues that the district court erred because it failed to apply

---

[2]Rand did not challenge the district court's finding that Pankey appropriated 16 acres and had the ability to perfect up to 160 acres. At oral argument Rand conceded that the land "within the fences" included the 16 acres. Therefore, because the Pankey entry only appropriated 16 acres, we conclude that Rand is entitled to only 16 acres with a priority date of 1872 based on the Pankey entry, and the remaining land "within the fences" has a priority date of 1901 based on the Dobbs entry.

[3]Rand challenges the district court's reliance on the BLM permits because he argues that under the Taylor Grazing Act the BLM can only consider grazing and water use on public lands as of 1929, which is well after these parties began their stock water appropriation. While the look-back provisions in the Federal Range Code may have affected the scope of the water rights considered by the BLM, Rand provides no argument or analysis considering the type of grazing permits held by the parties or their relationship to 43 C.F.R. § 501.4 (1959). As such, we do not consider this argument. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider arguments not cogently argued or supported by relevant authority).

"established Nevada law . . . that vested stock water rights . . . require an appropriator to prove a valid chain of title for the water right." Rand contends that there is no evidence demonstrating that Bradley held a possessory interest in Trout Creek or that any party in this action can otherwise establish a connection to Bradley.

We reject Rand's argument and conclude that vested stock water rights on public land pass by priority of possession—not by chain of title.[4] In *Steptoe Live Stock Co. v. Gulley*, we held that grazing livestock's use of water, without diversion by mechanical means, constitutes an appropriation sufficient to create a vested stock water right. 53 Nev. 163, 174-75, 295 P. 772, 775 (1931). In support of this conclusion, we cited 43 U.S.C. § 661, which deals with the appropriation of waters on *public* lands. *Id.* at 175, 295 P. at 775. We concluded that this federal statute "provides that rights *based upon priority of possession*, which have vested and accrued and are recognized and acknowledged by local custom, shall be maintained

---

[4]To the extent that in our prior order of reversal and remand we concluded that vested stock water rights on public lands pass by chain of title, we now expressly reject that conclusion. *See Rand Props., LLC v. Filippini*, Docket No. 66933 at 6-9 (Order of Reversal and Remand, April 21, 2016) ("In Nevada stock water rights on public domains are passed by chain of title." (citing *Steptoe Live Stock Co. v. Gulley*, 53 Nev. 163, 169-76, 295 P. 772, 773-776 (1931))). Our prior order cited to *Steptoe* in support of this erroneous conclusion, however, the reasoning set forth in *Steptoe* supports concluding that the priority of *vested* stock water rights are established by possession or beneficial use. *See Steptoe Live Stock Co. v. Gulley*, 53 Nev. 163, 168-69, 173-75, 295 P. 772, 773, 775 (1931) (determining that a plaintiff and its predecessors had stock water rights on public land because their appropriation without the diversion of the water was a well-established, customary appropriation and that federal law provides that vested and accrued rights established by priority of possession to water on public land, which "are recognized and acknowledged by local custom, shall be maintained and protected").

and protected." *Id.* (emphasis added). Because our reasoning in *Steptoe* is based on a federal statute that provides for stock water rights based on priority of possession of public lands, we see no reason to depart from applying priority of possession in this case, which also deals with stock water rights on public lands.

Further, Rand's citations to *Robison v. Bate*, 78 Nev. 501, 376 P.2d 763 (1962), and *Itcaina v. Marble*, 56 Nev. 420, 55 P.2d 625 (1936), for the proposition that vested stock water rights in public land are transferred by chain of title instead of by possession are unpersuasive. *See Robison*, 78 Nev. at 502-03, 376 P.2d at 763-64 (concerning the adjudication of vested irrigation and stock water rights on *private* land); *Itcaina*, 56 Nev. at 431-32, 436, 55 P.2d at 629, 631 (affirming a district court's grant of an injunction because the defendant had not complied with the necessary requirements to assert a stock water right under, the 1925 stock watering law but the plaintiff had by virtue of his and his predecessors-in-interest's *exclusive use* of that disputed public land to water cattle). Substantial evidence supports the district court's conclusion that Bradley established a possessory interest in Trout Creek in 1862, and that each party can trace its right to Bradley's original use of stock water based upon tax records. Therefore, we affirm the district court's finding that Rand, Filippini, and Tomera established an 1862 priority date for vested stock water rights.

*Bona fide purchaser*

In our prior remand order, we vacated the district court's ruling that Tomera owns certificate 12160 and the associated easement to use that stock water right, and we remanded the issue to the district court to address Rand's bona fide purchaser defense. *See Rand Props., LLC v. Filippini*, Docket No. 66933, at 9 (Order of Reversal and Remand, April 21, 2016). On remand, the district court concluded that Rand was not a bona fide

purchaser because it had constructive notice of Tomera's stock water right, and consequently that Tomera owns certificate 12160 and the associated easement. Specifically, the district court found that John Marvel, Rand's attorney hired to investigate the water rights attached to Trout Creek Ranch prior to Rand's purchase of that property, had knowledge of Tomera's stock water right, and thus, the court imputed that knowledge to Rand. Rand challenges several of the district court's factual findings to argue that it established its bona fide purchaser status as to Trout Creek Ranch and certificate 12160 as a matter of law.[5] Notably, however, Rand does not challenge the district court's ruling imputing Marvel's knowledge to Rand.

To benefit from the bona fide purchaser defense, "a party claiming title to the land by a subsequent conveyance must show that the purchase was made in good faith, for a valuable consideration; and that the conveyance of the legal title was received before notice of any equities of the prior grantee." *Berge v. Fredericks*, 95 Nev. 183, 186, 591 P.2d 246, 247 (1979). A purchaser has "[a] duty of inquiry . . . when the circumstances are such that a purchaser is in possession of facts which would lead a reasonable man in his position to make an investigation that would advise him of the existence of prior unrecorded rights." *Allison Steel Mfg. Co. v. Bentonite*,

---

[5]Rand argues that Tomera cannot hold certificate 12160 because NRS 533.382 requires that water rights be conveyed by deed and pursuant to NRS 533.383(2) an unrecorded deed is "void as against a subsequent purchaser who in good faith and for valuable consideration purchases the same application, right, certificate or permit, or any portion thereof, if the subsequent purchaser first records the deed in compliance with NRS 533.382." We reject Rand's argument because, as we explained in our prior remand order, NRS 533.382's requirement that water rights be conveyed by deed came into effect after Tomera's purchase. *See Rand Props., LLC v. Filippini*, Docket No. 66933 at 8 (Order of Reversal and Remand, April 21, 2016).

*Inc.*, 86 Nev. 494, 498, 471 P.2d 666, 668 (1970) (internal quotation marks omitted). A purchaser will be deemed to have "[constructive] notice of whatever the search would disclose." *Id.* (internal quotation marks omitted). A subsequent purchaser may rebut the notice presumption by demonstrating that he conducted a sufficient investigation without uncovering a prior right. *Berge*, 95 Nev. at 189-90, 591 P.2d at 249. Additionally, "[n]otice to an attorney is, in legal contemplation, notice to his client." *Lange v. Hickman*, 92 Nev. 41, 43, 544 P.2d 1208, 1209 (1976).

We conclude that substantial evidence supports the district court's finding that Rand was not a bona fide purchaser, such that Tomera holds certificate 12160 and an associated easement along the Trout Creek pipeline. Marvel testified thoroughly on the matter, and the district court provided detailed factual findings regarding Marvel's knowledge on the issue. Additionally, Rand failed to rebut the notice presumption because neither Rand nor Marvel consulted with Tomera concerning its claim to the Trout Creek pipeline, as evidenced in the BLM Assignment of Range Improvements. Because we conclude that Tomera owns certificate 12160 and Rand conceded in its opening brief that such a conclusion would mean that "Tomera would have an implied easement to maintain and repair the pipeline," we need not address the district court's findings as to the easement, and we thus affirm the district court's findings as to the bona fide purchaser issue.

Accordingly, for the reasons set forth above, we

ORDER the judgment of the district court AFFIRMED IN PART and REVERSED IN PART.

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Herndon

cc:     Hon. Jim C. Shirley, District Judge
        Marvel & Marvel, Ltd.
        Parsons Behle & Latimer/Reno
        Schroeder Law Offices, P.C.
        Gerber Law Offices, LLP
        Clerk of the Court/Court Administrator

PICKERING, J., with whom CADISH, J., and SILVER, J., agree, concurring in part and dissenting in part:

Absent from the majority opinion is any engagement with or meaningful analysis of the myriad historical transfers of ownership of the real property abutting Trout Creek. To be sure, establishing a timeline of the transfers of those land parcels at issue is complicated; but, it is also immensely probative of the questions at hand. Specifically, with regard to the 16 acres of vested water rights that the majority finds conveyed to the appellant, William Rand, "appurtenant to the land" deeded in the so-called "Pankey entry": a close examination of the district court's factual findings as to the ownership of that land and related water rights, and the substantial record support for those findings, counsels affirmance, not reversal, of the district court. *Keife v. Logan*, 119 Nev. 372, 374, 75 P.3d 357, 359 (2003) (stating that "this court will not disturb a district court's findings of fact if they are supported by substantial evidence").

To wit, William Pankey established the (Pankey) Trout Creek Ranch on Trout Creek in 1872, began paying taxes on his 160-acre possessory claim the following year, and subsequently filed a Water Ditch and Flume claim from Trout Creek, evidencing his intent to irrigate the entirety of that acreage. But despite his apparently expansive irrigation plans, Pankey only ever put enough Trout Creek water to beneficial use to irrigate around ten percent of his 160 acres, ultimately perfecting water rights as to 16 acres. Pankey then transferred the entire 160-acre parcel to J.A. Blossom, via a deed that specifically purported to transfer Pankey's water and ditch claim, and "all water rights and privileges thereto belonging or in any way appertaining" to (Pankey) Trout Creek Ranch. The

SUPREME COURT
OF
NEVADA

(O) 1947A

parties do not dispute that the 16 acres of then-vested water rights transferred with this deed.

Blossom then deeded all of his property to his wife, Elvira Blossom. And Elvira transferred the entire 160-acre (Pankey) Trout Creek Ranch parcel to Gottlieb Hoffman (respondent Filippini's undisputed predecessor-in-interest), again via deed expressly including "all water rights belonging to said Trout . . . Creek Ranch." And so, again, there is no dispute that the aforementioned 16 acres of vested water rights transferred alongside it. Hoffman later married Lisette Rufli, who had obtained via a prior marriage the real property and water rights in a separate land parcel abutting Trout Creek. As a result of this union, Hoffman's holding of the (Pankey) Trout Creek Ranch, and his prior ownership of yet one more land parcel on Trout Creek, Hoffman then became the sole appropriator of Trout Creek's waters.

Subsequent to Hoffman's accumulation of the land surrounding and rights to appropriate the waters of Trout Creek, he and Lisette limitedly deeded to Walter Dobbs (appellant Rand's undisputed predecessor-in-interest) what the district court determined to be only a portion of the Hoffmans' combined holdings—specifically, the *fenced portion* of the 160-acres of (Pankey) Trout Creek Ranch (which the district court estimated to be less-than 20 acres)—with the additional assurance there was "*enough water from . . . Trout Creek to irrigate the land within these fences.*" The language of this "enough water" clause strikes at the heart of the issue—the majority interprets it as the Hoffmans' grant of the specific vested water rights in 16 acres originally perfected by Pankey decades prior. However, this unusual language is more easily read as an affirmation by the Hoffmans to Dobbs that there was plenty of water available in Trout

Creek to irrigate the fenced acreage they were transferring, and they would not deny access to the same. And the plain meaning of this specific deed's text holds greater persuasive value than the general principles of construction upon which the majority relies. *See Eaton v. J. H., Inc.*, 94 Nev. 446, 450, 581 P.2d 14, 16 (1978) (noting that the district court properly looked to a deed's plain meaning first).

Even very generously contorted in Rand's favor, the divergent clause only begs a question that cannot necessarily be answered by resort to the four corners of the deed alone, because it renders the deed ambiguous. And even assuming such an ambiguity, the district court appropriately looked to extrinsic evidence to understand the "enough water" clause's effect, *Skyland Water Co. v. Tahoe-Douglas Dist.*, 95 Nev. 289, 292-93, 593 P.2d 1066, 1067 (1979) (noting that a court may look to extrinsic evidence to interpret a deed where its language is ambiguous), which supported the latter interpretation given above, in any case. Specifically, the district court contrasted the "conspicuous and telling" differences between the express grants of water rights in the Pankey/Blossom and Blossom/Hoffman deeds and the language at issue here. And, the district court weighed testimony by Filippini's expert regarding this dichotomy, that the "enough water" language was intentionally exclusionary of the Hoffmans' then decades-perfected water rights—a transfer that would otherwise have "dramatically . . . impacted [Hoffman's] entire operation." Indeed, the district court noted the "fundamental importance" of the Hoffmans' interests in these rights and reasoned that "[t]o suggest that Hoffman would knowingly cause injury to his own ranch operations, land and water use, belies common sense. It is far more reasonable to conclude that Hoffman allowed Dobbs 'enough water,' or the right to create a vested right through

beneficial use, as the documents plain language suggest[,] in an effort to protect Hoffman's own interests."

Instead, as Filippini's expert affirmed, the clause was only meant to assure Dobbs that the Hoffmans would not prevent him from *perfecting rights of his own* in Trout Creek's waters through his subsequent beneficial use. The district court found this testimony, which was rationally based on the record evidence discussed above, to be credible and persuasive. By the same token, the district court found the testimony of Rand's expert to be of "limited probative value because his conclusions were not independently researched," but instead were based on Rand's chain of title documents. And the district court expressed reason to doubt the reliability of any such evidence—noting that in a slightly different but related context, Rand had "trie[d] to recreate history by concluding [other Trout Creek] water rights of use were transferred to Blossom (and then to Dobbs). While it is true that a portion of . . . [r]anch lands changed ownership from [the prior owner] to Blossom, the water use appurtenant to that . . . land, stayed appurtenant to that . . . [now Filippini] property . . . . The evidence cannot be manipulated by Rand otherwise." (Footnote omitted.) Deference is owed to such determinations. *See Quintero v. McDonald*, 116 Nev. 1181, 1184, 14 P.3d 522, 524 (2000) (stating that "[t]he credibility of witnesses and the weight to be given their testimony is within the sole province of the trier of fact").

Accordingly, while the majority holds that Rand's chain of title for his section of the 160-acre (Pankey) Trout Creek Ranch includes the specific vested water rights in 16 acres perfected by Pankey such that Rand's priority date for Trout Creek waters relates back to Pankey's initial beneficial use, I respectfully disagree. I would instead defer to the district

court's exercise of power over its sole province—crediting Filippini's expert's testimony that Hoffman in fact reserved those vested rights (such that they ultimately lay with Filippini, his predecessor-in-interest)—and its logical contrasting of the language of the deed at issue with those that came prior, and affirm the well-supported order, as a whole.

_Pickering_ , J.
Pickering

We concur:

_Cadish_ , J.
Cadish

_Silver_ , J.
Silver