EARL C. EATON; BETTY EATON; PAUL EATON; AND J. R. BET, INC., A NEVADA CORPORATION, APPELLANTS, *v.* J. H. INC., AKA JACK HARPER, INC., AKA CUSTO-MUSIC INCORPORATED; WESTERN DIVERSIFIED CORPORATION; CHARLES L. McCARTY AND ANN P. McCARTY, RESPONDENTS.

No. 9451

July 12, 1978            581 P.2d 14

*M. Jerome Wright,* Reno; and *Rupert C. Schneider,* Ely, for Appellant.

*Cooke, Roberts and Reese,* Reno, for Respondent J. H. Inc.

*Cromer, Barker & Michaelson,* and *Victor Alan Perry,* Reno, for Respondents Western Diversified Corporation and the McCartys.

## OPINION

*Per Curiam:*

This is an appeal from a judgment finding certain of the appellants, who were defendants below, liable for damages resulting from breach of their contract with respondent J. H. INC., aka JACK HARPER, INC., aka CUSTOMUSIC INCORPORATED [hereafter Customusic], and from dismissal of their third-party complaint against respondents Western Diversified, Charles L. McCarty and Ann P. McCarty.

1. *The Facts.*

In 1972 appellant Earl Eaton and his partner, Paul Alexander, owners of the Oasis Bowl, negotiated an agreement with Customusic, a supplier of pool tables and game machines. Customusic agreed to loan the partners $19,000 for the addition of

a game room to their business, in exchange for an exclusive right to place machines in the Oasis Bowl for a period of ten years. The loan was to be repaid from the partners' share of the proceeds of the machines, except that the balance of the loan would be payable on demand should the agreement be breached. The partners also agreed to "fully insure" Customusic against loss or damage to the machines. The agreement provided that in the event of a sale or transfer of the business, the agreement would be binding upon the partners' successors or assigns, and that the partners would remain liable, unless the purchaser or transferee assumed the agreement.

In the spring of 1973, Eaton and Alexander agreed between themselves to dissolve their partnership, with Eaton retaining all the partners' interest in the Oasis Bowl. Eaton subsequently formed J. R. Bet, Inc., which assumed operation of the Bowl. In July, 1974, J. R. Bet, Inc., entered a lease-purchase agreement with respondents Western Diversified and the McCartys. No mention was made in the lease or deed of the initial agreement with Customusic.

In October, 1974, Customusic filed suit against Earl Eaton and Paul Alexander, alleging breach of their 1972 agreement, and praying for immediate repayment of the balance of the loan, plus liquidated damages at the contractual rate of $250 per week for the remainder of the ten-year term. Eaton and Alexander filed a third-party complaint against Western Diversified and respondents McCarty, alleging that they had assumed the Customusic contract. The defendants also alleged that their obligations had been assumed by J. R. Bet, Inc. Plaintiff Customusic subsequently filed an amended complaint adding J. R. Bet, Inc., and its officers Betty and Paul Eaton, as parties defendant.

Prior to trial, third-party defendants Western Diversified and the McCartys ,moved for a court order permitting them to remove plaintiff's machines from the Oasis Bowl, and to contract for their replacement by some other party. The motion was denied pending determination of the issues raised by the third-party complaint.

Trial was held before the court, sitting without a jury. At its conclusion, judgment was entered against defendants Earl Eaton, Paul Alexander and J. R. Bet, Inc., in the amount ot $79,633.50. Defendants' third-party complaint against Western Diversified was dismissed, with prejudice.

This appeal is brought by defendants Earl Eaton, Betty Eaton, Paul Eaton and J. R. Bet, Inc., and is not joined by defendant Alexander. As a preliminary matter, we note that appellants Betty Eaton and Paul Eaton were subjected to no

liability by the judgment, and therefore the appeal is dismissed as to them. NRAP 3A(a).

2. *Breach of the Contract.*

Appellants contend that the only breach which may be considered as a basis for liability is that of the insurance provision, since that was the only breach alleged in plaintiff's amended complaint. This contention is unsound. Plaintiff also alleged that defendants leased and conveyed the Oasis Bowl "without requiring the third-party defendants to assume the agreement between plaintiff and defendants Earl C. Eaton and Paul E. Alexander". The provisions of the contract requiring the assignees and successors of the partners to be bound by the original agreement were incorporated by reference in the amended complaint. Plaintiff therefore alleged facts entitling him to relief as a result of this breach as well. NRCP 8(a) and (e).

There is no merit to appellants' contention that the trial court erred in finding that the agreement to "fully insure" Customusic's equipment had been breached. Appellants primarily rely upon the certificate of insurance received in evidence to show that the equipment was adequately covered. Yet that certificate on its face states that the loss payable provision to Customusic was "as regards pool tables only".

Both the court's findings, that appellants had breached the provision regarding assumption (see below) and that appellants had breached the insurance provision, are supported by substantial evidence and therefore must be upheld. L. M. Enterprises, Inc. v. Kenny, 92 Nev. 653, 556 P.2d 547 (1976).

3. *Assumption by Third-Party Defendants.*

The trial court found that third-party defendants Western Diversified and Charles and Ann McCarty had not assumed the agreement with Customusic. Appellants contend that this finding is not supported by substantial evidence. This contention is meritless.

Third-party defendants took over operation of the Oasis Bowl pursuant to an agreement with J. R. Bet, Inc., which included their outright purchase of aportion of the property, including the game room, and a lease of the remainder of the property, with an option to purchase. Neither the deed to the property which they purchased outright nor the lease of the remainder of the property mentioned the 1972 agreement with

Customusic, although the lease explicitly provided for the assumption of the contract with the supplier of bowling equipment. The contract with third-party defendants was thus clear and unambiguous; there was no assumption by third-party defendants of the Customusic agreement. It is therefore unnecessary to discuss the evidence of the facts and circumstances surrounding its execution. The trial court correctly applied the plain meaning of the contract, and its decision is therefore upheld. Fredricks v. City of Las Vegas, 76 Nev. 418, 356 P.2d 639 (1960); Christmas v. Cooley, 406 P.2d 333 (Colo. 1965).

4. *Lost Profit Damages.*

The trial court awarded $69,760 to Customusic as "loss of profits to plaintiff for the remainder of the term of the agreement". Appellants challenge both the appropriateness of a lost profits award in this instance and the trial court's determination of the amount of the award.[1]

The goal of a damage award for breach of contract is that "the breaching party must place the nonbreaching party in as good a position as if the contract were performed." Lagrange Constr., Inc. v. Kent Corp., 88 Nev. 271, 275, 496 P.2d 766, 768 (1972). The award should include the "losses caused and gains prevented by the defendant's breach, in excess of savings made possible". Restatement, Contracts, § 329, at 503 (1932). It is clear that when plaintiff, as here, is prevented from performing the balance of the term of his contract, lost profits are generally an appropriate measure of damages so long as the evidence provides a basis for determining, with reasonable certainty, what the profits would have been had the contract not been breached. Restatement, Contracts, § 331, at 515; 5 Corbin on Contracts, § 1023, at 147 (1964); Bradley v. Nevada-California-Oregon Ry., 42 Nev. 411, 178 P. 906 (1919); Cladianos v. Friedhoff, 69 Nev. 41, 240 P.2d 208 (1952). It is also the rule that a record of past profits of an established enterprise provides a valid basis for determining such future profits with reasonable certainty. Corbin, *supra;* McCormick on Damages, § 29, at 107 (1935); Fireman's Fund Ins. Co. v. Shawcross, 84 Nev. 446, 442 P.2d 907 (1968); *cf.* Knier v. Azores Constr. Co., 78 Nev. 20, 368 P.2d 673 (1962).

Appellants suggest that the amount of lost profits awarded by the trial court is not supported by the evidence in the record.

---

[1]Neither appellants nor respondents dispute the trial court's decision to award actual damages, rather than to enforce the clause of the contract providing for $250 per week "liquidated damages." *See* Golden v. McKim, 37 Nev. 205, 141 P. 676 (1914).

The court based its calculations upon the "$160 per week average plaintiff's share" of the income of the machines during the time that they were placed in the Oasis Bowl. The court then multiplied this amount by the number of weeks from the transfer of the Oasis Bowl to Western Diversified to the end of the term of the agreement, in order to arrive at a total "lost profits" award.

Appellants contend that the trial court erred in its determination that plaintiff's lost profits were $160 per week, on the ground that the court failed to take into account plaintiff's costs of supplying the machines. It is clear that "[i]f the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return . . . the amount of this saving [must be] deducted from the damages that would otherwise be recoverable". Restatement, Contracts, § 335, at 533. This rule is applicable only if the evidence indicates that plaintiff would actually save expense by the discharge of his performance; any fixed expenditures which would not be decreased as a consequence of his nonperformance are not to be taken into account. Schubert v. Midwest Boadcasting Co., 85 N.W.2d 449 (Wis. 1957); F. A. Bartlett Tree Expert Co. v. Hartney, 32 N.E.2d 237 (Mass. 1941).

In this case, the court specifically noted that "the evidence shows that substantially more than $160 per week was made during good months" and that the decrease in income was at least partially attributable to "failure of cooperation by the defendants". Since the trial court was entitled to adjust the past profit figure to take into account the effect of defendants' conduct, see Willred Co. v. Westmoreland Metal Mfg. Co., 200 F.Supp. 59, 64 (E.D.Pa. 1961), it may well have found that any expenditures actually saved by plaintiff were offset effects. The factual finding of the trial court that plaintiff's lost profits were $160 per week are supported by substantial evidence in the record and may not be disturbed on appeal. See Cladianos v. Friedhoff, supra.

Appellants' final claim is that the trial court erred in awarding plaintiff lost profits from the date of the transfer of the Oasis owl to estern Diversified. We agree.

The record clearly indicates that plaintiff continued to collect its share of the proceeds of the machines after the date of the transfer, and indeed through the trial itself. On the other hand,

it was clear that removal of plaintiff's machines from the premises was reasonably certain to occur, once the court had determined that third-party defendants were not bound by the agreement with Customusic. In order to prevent double recovery by the plaintiff and, at the same time, ensure that plaintiff recovers damages for the gains actually prevented by defendants' breach, on remand the court should ascertain the time at which the plaintiff actually stopped collecting its share of the proceeds, and base the award of damages on the number of weeks thereafter remaining in the term of the agreement, rather than upon the number of weeks from the date of their takeover of the business.

5. *Earl Eaton's Personal Liability.*

Since counsel for appellants conceded, during oral argument, that Earl Eaton's continuing personal liability under his contract with Customusic is not contested, it is unnecessary for this court to discuss whether he would also properly be found liable under an alter ego theory. Goldsworthy v. Johnson, 45 Nev. 355, 204 P. 505 (1922).

*Conclusion.*

The trial court's determination of the amount of lost profits, as a portion of the damage award, is reversed. In all other respects the decision of the trial court is affirmed. The case is remanded with instructions to enter judgment in conformity with this opinion.

RICHARD TAM, Appellant, *v.* STANTON R. COLTON and Additional Parties Ordered by the Court, FRED ANDERSON, JAMES L. BUCHANAN, II, JOHN BUCHANAN, LILLY FONG, CHRIST N. KARAMANOS, MOLLY F. KNUDTSEN, LOUIS E. LOMBARDI, BRENDA MASON, JOHN TOM ROSS, Individually and as the Board of Regents of the University of Nevada, ALAN ELLSBERG, RONALD KENNETH FORNER, MICHAEL J. SIGNORELLI, Jr., and the STATE OF NEVADA, Respondents.

No. 10919

JOHN TOM ROSS, Appellant, *v.* BOARD OF REGENTS OF THE UNIVERSITY OF NEVADA, JAMES BUCHANAN, Chairman, and Members FRED ANDERSON, LOUIS E. LOMBARDI, CHRIST N. KARAMANOS, BRENDA MASON, LILLIAN FONG, MOLLY F. KNUDTSEN and JOHN BUCHANAN, and

MIKE O'CALLAGHAN, GOVERNOR OF THE STATE OF NEVADA, RESPONDENTS.

No. 10942

July 19, 1978          581 P.2d 447

*Morris & Wood,* Las Vegas, for Appellant Tam.

*John Tom Ross,* Carson City, for Appellant Ross.

*George E. Holt,* District Attorney, Clark County, for Respondent Colton.

*Robert List,* Attorney General; *Donald Klasic,* Deputy Attorney General; and *Larry Lessly,* University Counsel, for other Respondents.

## OPINION

*Per Curiam:*
NRS 396.040 prescribes a nine-member Board of Regents for

the University of Nevada System, each member elected to fill a six-year term of office. Two members are elected from Washoe County (District One), five members are elected from Clark County (District Two), and two members are elected from the remainder of the State (District Three). The terms of the members of the Board are staggered, so that three members are elected every two years.

NRS 396.041 divides Clark County (District Two) into five geographic subdistricts, each consisting of several Nevada Assembly districts. At the 1978 General Election, two members from Clark County are to be elected to six-year terms. In Subdistrict "C", one additional member is to be elected to fill the remaining two years of a six-year term commenced in 1974. *See,* 396.060.

On May 26, 1978, Richard Tam, the appellant in No. 10919, attempted to file a declaration of candidacy for the Board of Regents for a four-year term on an at-large basis in District Two. Respondent Colton, the Registrar of Voters for Clark County, refused to accept the filing unless Tam filed as a candidate for the unexpired part of the six-year term in Subdistrict "C", the subdistrict in which he resides. Tam then filed a petition for writ of mandamus, requesting the court to compel Colton to accept his declaration of candidacy, and raising two contentions. He first argued that the six-year term of office prescribed by NRS 396.040 violates Article 15, § 11 and Article 11, § 7 of the Nevada Constitution. He further contended that the subdistricting scheme outlined in NRS 396.041 results in the dilution of the voting power of the residents of his subdistrict, in violation of the 14th Amendment to the Constitution of the United States. On June 22, 1978, the district court for the Eighth Judicial District denied the petition for writ of mandamus, and Tam perfected this appeal.

On September 29, 1977, John Tom Ross, the appellant in No. 10942 and a Regent of the University of Nevada, filed an action under NRS 30.010, *et seq.* (the Uniform Declaratory Judgments Act), seeking a judicial declaration that the six-year term of office prescribed by NRS 396.040 is unconstitutional, and thus that certain administrative actions taken by the Board of Regents following votes involving the participation of certain members then in the last two years of their six-year terms were null and void. On May 31, 1978, the district court for the First Judicial District ruled that the six-year term prescribed by NRS 396.040 did not conflict with the Nevada Constitution, and Ross appealed.

Because these two actions involve substantially identical issues (with the exception of the equal protection apportion-

ment claim, which is pressed solely by Appellant Tam in No. 10919), we ordered consolidation on appeal. For the reasons that follow, we affirm the judgment of the district court in both cases.

I. *Standing.*

Appellant Tam asserts standing to prosecute his action alternatively as a candidate for Regent and as a registered voter in and resident of Subdistrict "C", District Two. Since the challenged provisions of the Nevada Revised Statutes in this case do not involve candidate qualifications as such, we fail to see how Tam as candidate has standing to assert any constitutional violation as to himself. *Contrast,* Buckley v. Valeo, 424 U.S. 1, 12 (1975); Stoner v. Fortson, 379 F.Supp.704 (D.Ga.1972); Mortillaro v. State of La., 356 F.Supp. 521 (D.La. 1972). However, Tam's failure to assert any legally protectable interest as a candidate is not fatal to this action, for it is clear not only that a candidate has standing to assert the constitutional rights of the voters in his district, Walgren v. Board of Selectmen of Town of Amherst, 519 F.2d 1364 (1st Cir. 1975); Mancuso v. Taft, 476 F.2d 187 (1st Cir. 1973), but also that Tam in his capacity as voter in his particular district possesses the requisite standing to assert the claims presented in this case. Clark County v. City of Las Vegas, 94 Nev. 74, 574 P.2d 1013 (1978).

Appellant Ross has based his claim on the Uniform Declaratory Judgments Act, NRS 30.010, *et seq.* As a member of the Board of Regents, he is clearly a "person . . . whose rights, status or other legal relations are affected by a statute." NRS 30.040. He, therefore, has the requisite standing to challenge the six-year terms prescribed under NRS 396.040.

II. *The Six-Year Term.*

In 1971, the Nevada Legislature amended NRS 396.040 to change the term of office of members of the Board of Regents from four years to six years. 1971 Stats. 1531. The appellants contend that any term longer than four years violates Article 15, § 11 and Article 11, § 7 of the Nevada Constitution.

1. Article 15, § 11 of the Constitution provides in pertinent part:

> "The tenure of *any office not herein provided for* may be declared by law, or, when not so declared, such office shall be held during the pleasure of the authority making the appointment, *but the legislature shall not create any*

*office the tenure of which shall be longer than four (4) years,* except as herein provided in this constitution.'' (Emphasis supplied.)

The office of Regent of the University of Nevada is created by the Constitution. Article 11, § 7. *See,* King v. Board of Regents, 65 Nev. 533, 200 P.2d 221 (1948). This being so, the four-year term limitation imposed under Article 15, § 11 has no application in this case. *See,* 1929 Op. Atty. Gen. 326. Rather, unless the term of office of a Regent of the University is otherwise limited under the terms of the Constitution, the legislature is free to prescribe a term longer than four years. We see no conflict between the terms of Article 15, § 11 and NRS 396.040.

2. The appellants contend however that such a specific term limitation does exist in Article 11, § 7. That Section reads:

*"Board or Regents: Election and Duties.* The Governor, Secretary of State, and Superintendent of Public Instruction, shall *for the first Four Years and until their successors are elected and qualified* constitute a Board of Regents to control and manage the affairs of the University and the funds of the same under such regulations as may be provided by law. But the Legislature shall at its regular session next preceding the expiration of the term of Office of said Board or Regents provide for the election of a new Board of Regents and define their duties.'' (Emphasis supplied.)

The use of the term *"first* Four Years,'' it is argued, conveys the framers' intent there should follow *subsequent* four-year terms. Thus, the term of office is fixed by the Constitution at four years.

This particular interpretation of Article 11, § 7, however, is belied both by a short survey of the constitutional debates and by the legislative practice in the intervening one hundred thirteen years since the enactment of Article 11, § 7. A survey of the constitutional debates reveals that an amendment to Article 11, § 7 specifically authorizing the legislature to fix the terms of the Board of Regents was rejected for the reason that it was thought that the legislature already possessed such a power under Article 11, § 4 of the Constitution.[1] Marsh, *Reports of the 1863 Constitutional Convention of the Territory of Nevada* (1972 ed.) 588–589.

---

[1] Mr. Nourse: ''I move to add to that amendment the words 'and fix their term of office'.'' Mr. Brosnan: ''I think that is provided for already.'' Mr. Collins: ''Section 4, I believe it is, covers that ground.''

Article 11, § 4 reads: *'' Establishment of state university; control by board of*

*regents.* The Legislature shall provide for the establishment of a State University which shall embrace departments for Agriculture, Mechanic Arts, and Mining, *to be controlled by a Board of Regents whose duties shall be prescribed by Law.*" (Emphasis supplied.)