**AMERICAN HERITAGE, INC., d/b/a The Gillman Group, Appellant,**

v.

**NEVADA GOLD & CASINO, INC., Appellee.**

**and**

**Nevada Gold & Casino, Inc., Appellant,**

v.

**Fred Gillman, Appellee.**

**No. 01–07–00057–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 7, 2008.

Rehearing Overruled April 7, 2008.

Alice Oliver–Parrott, Maria Teresa Arguindegui, Burrow & Parrott, L.L.P., Jennifer R. Tillison, Robert Dubose, Roger D. Townsend, Alexander Dubose Jones & Townsend, LLP, Houston, TX, Robert M. Steele, Herron & Steele, P.C., San Diego, CA, for Appellant.

Allison Baker Waters, J. Mark Brewer, Brewer & Pritchard, P.C., Joseph S. Grinstein, Robert Rivera Jr., Susman Godfrey L.L.P., Thomas C. Wright, Wright Brown & Close, LLP, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

American Heritage, Inc., d/b/a The Gillman Group (American Heritage) appeals the judgment against it in this breach of contract case, contending that, under Nevada law: (1) Nevada Gold & Casino, Inc. (Nevada Gold) lacks standing to assert its claims; (2) the trial court erred in granting Nevada Gold's motion for judgment notwithstanding the verdict on rescission, improperly disregarding the jury's finding that American Heritage returned everything of value to Nevada Gold; (3) the damages award in favor of Nevada Gold is not supported by legally sufficient evidence; and (4) the trial court erred in awarding prejudgment interest. In its cross-appeal, Nevada Gold contends that, under Texas law, the trial court erred in granting American Heritage's motion for j.n.o.v. on alter ego, improperly disregarding the jury's finding that Fred Gillman (Gillman) is responsible for American Heritage's conduct. We conclude that Nevada Gold has standing to assert its claims, legally sufficient evidence supports the damages award, and the trial court did not err in granting j.n.o.v. on American Heritage's rescission claim and Nevada Gold's alter ego claim. We further conclude that Nevada law precludes an award of prejudgment interest in this case. We therefore modify the judgment to delete the award of prejudgment interest and, as modified, affirm.

## Background

This case arises out of an agreement to finance and develop a casino on tribal lands in New Mexico. American Heritage had expertise in the gaming industry and helped various Native American tribes throughout the United States open and operate casinos. Its expertise led to negotiations with the Pueblo of Laguna Tribe to develop a large casino, to be named the "Route 66 Casino." American Heritage and the tribe's development corporation entered into various contracts in which American Heritage agreed to provide consulting services, lease gaming equipment, and provide financing for the casino.

In early 2002, after the tribe opened and began earning a profit at a temporary casino on the future site of the Route 66 Casino, American Heritage began discus-

sions with Nevada Gold about funding for the casino project. Nevada Gold is a developer and operator of gaming facilities and other lodging and entertainment sites, and also has experience working with Native American tribes. American Heritage and Nevada Gold entered into a contract, entitled the Amended and Restated Operating Contract (the operating contract), to form a limited liability corporation (LLC). In the operating contract, Nevada Gold agreed to use its best efforts to pursue financing for the casino project in exchange for essentially half of the net profits that American Heritage would receive under its contracts with the tribal development corporation.

Nevada Gold provided American Heritage $250,000 cash, secured by a promissory note that was convertible into equity in the LLC, in furtherance of its obligations under the contract. Within a month of signing the contract, American Heritage notified Nevada Gold that the tribe was considering the possibility of self-financing, but left Nevada Gold to continue pursuing financing so that funds would be in place by the November 2002 closing date for the project. In September 2002, however, American Heritage notified Nevada Gold that the tribe had decided to self-finance, and that Nevada Gold could no longer participate in the casino project. American Heritage continued with the project without Nevada Gold.

The Route 66 Casino opened about a year later. After approximately two years of profitable operations, American Heritage sold its interest in the casino to the tribe for $12.1 million.

Nevada Gold instituted an arbitration proceeding against American Heritage near the end of September 2002. It also demanded that American Heritage return the funds it provided that were secured by the promissory note. American Heritage repaid the note with interest. Soon after-ward, Nevada Gold brought this suit against American Heritage in Harris County, seeking its contractual profit.

After several weeks of trial, the jury found that American Heritage breached the operating contract, and it awarded $8.3 million to Nevada Gold. The jury also responded affirmatively to the question whether American Heritage had "returned everything of value [it] received from Nevada Gold" under the contract, and that Gillman was individually responsible for the actions of American Heritage. After considering the parties' post-verdict motions, the trial court entered judgment on the jury's verdict in favor of Nevada Gold and awarded prejudgment interest on that amount. The trial court granted Nevada Gold's motion for j.n.o.v. on the jury's finding that Nevada Gold returned everything of value, and granted Gillman's motion for j.n.o.v. on the jury's finding that he was responsible for American Heritage's conduct. The parties timely appealed.

## Discussion

### I. Standing

Before reaching the merits of its appeal, American Heritage challenges Nevada Gold's standing. Standing, a necessary component of subject matter jurisdiction, is a constitutional prerequisite to maintaining a suit under Texas law. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993). A standing defect cannot be waived, and can be raised for the first time on appeal. *Id.* at 445–46. A party's standing to pursue a cause of action is a question of law we review de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998).

"A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority...." *Nootsie, Ltd. v. Williamson County Ap-*

*praisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Specifically, a plaintiff has standing to sue if: (1) the plaintiff has sustained, or is immediately in danger of sustaining, some direct injury as a result of a complained-of wrongful act; (2) there is a direct relationship between the alleged injury and the claim asserted; (3) the plaintiff has a personal stake in the controversy; (4) the challenged action has caused the plaintiff some injury in fact; or (5) the plaintiff is an appropriate party to assert both its own interest and the public interest in the matter. *El Paso Cmty. Partners v. B & G/Sunrise Joint Venture*, 24 S.W.3d 620, 624 (Tex.App.-Austin 2000, no pet.).

■ A party to a contract has standing to maintain a suit on the contract. *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 618 (Tex.2004). American Heritage contends that Nevada Gold has no standing to sue on the contract because the contract contemplates an LLC, which supplants any right Nevada Gold has to seek relief under the contract. Thus, American Heritage contends, Nevada Gold might be able to bring a derivative suit against American Heritage on behalf of the limited liability company, but it has no standing individually. We disagree. A limited liability company member may have an individual action against a defendant for a claim that the defendant has breached a contractual duty owed directly to the shareholder, individually. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex.1990) (quoting *Mass. v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 222 (1942)). The nature of the alleged wrong indicates whether the individual or solely the company has standing. *Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex.App.-Tyler 2006, pet. denied) (citing *Faour v. Faour*, 789 S.W.2d 620, 621–22 (Tex.App.-Texarkana 1990, writ denied)).

Nevada Gold lacks standing as a derivative shareholder because American Heri-

tage's breach of the contract barred Nevada Gold from procuring any interest in the LLC. American Heritage's contention, as applied to these facts, is tantamount to saying that an individual who contracts with another party to purchase shares of a corporation and then is prevented by that party's breach from completing the purchase must sue as a derivative shareholder. The parties' agreement belies this contention. The operating contract expressly recognizes that each member owes duties to the other and provides for the possibility that a member may take legal action against another Member "arising between them out of this Agreement." Nevada Gold's suit against American Heritage falls within this description. Accordingly, we conclude that we have subject matter jurisdiction over Nevada Gold's claims.

## II. Choice of Law—Nevada

The operating contract between American Heritage and Nevada Gold expressly calls for the application of Nevada law. Both parties confirm that Nevada substantive law controls their claims. We apply Texas procedural law in addressing the issues raised in this appeal. *Nexen Inc. v. Gulf Interstate Eng'g Co.*, 224 S.W.3d 412, 417 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

## III. Rescission

American Heritage claims that, because the jury answered "yes" to the question whether American Heritage returned everything of value received under the contract and the evidence supports the jury's finding, the trial court erred in granting Nevada Gold's motion for j.n.o.v. Instead, American Heritage contends, the trial court should have concluded from the jury's finding that Nevada Gold had rescinded the contract, and thus was pre-

cluded from seeking benefit of the bargain damages by its pre-suit conduct. We review this challenge to the propriety of the trial court's j.n.o.v. under the legal sufficiency standard. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005); *Harris v. McFerren*, 788 S.W.2d 76, 78 (Tex.App.-Houston [1st Dist.] 1990, writ denied). Under this standard, we view the evidence in a light most favorable to the jury's verdict, and indulge every reasonable inference in its support, reversing only if the evidence does not allow reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 823–24, 827.

*Nevada law on rescission*

In *Great American Insurance Co. v. General Builders, Inc.*, the Nevada Supreme Court explained that:

> Rescission may be accomplished in one of two ways: In what is called "legal rescission," a party, in response to a material breach on the part of the other party or for other valid reasons, unilaterally cancels the contract; alternatively, in what is known as "equitable rescission," the aggrieved party brings an action in a court with equitable jurisdiction asking the court to nullify the contract.

113 Nev. 346, 934 P.2d 257, 262 (1997).[1] The trial court's question to the jury derives from language set forth in *Bergstrom v. Estate of DeVoe*, 109 Nev. 575, 854 P.2d 860 (1993). In *Bergstrom*, the plaintiff, not the defendant, pleaded for the equitable remedy of rescission of the contract. The Nevada Supreme Court explained that if parties partially perform a contract and one party breaches, the non-breaching party may elect to return everything of value it received under the contract and thereby rescind the contract. 854 P.2d at 861. *Bergstrom* does not address whether or how a party may invoke rescission as an affirmative defense, as American Heritage attempts here.

■ American Heritage does not use rescission in either way recognized under Nevada law. Rather, it advances rescission as if it is akin to the affirmative defense of accord and satisfaction. Regardless of the label that American Heritage attaches to its affirmative defense— whether rescission or accord and satisfaction—under Nevada law, it must prove the existence of a mutual agreement to extinguish any rights arising under the original contract. *See Bates v. Chronister*, 100 Nev. 675, 691 P.2d 865, 869 (1984) (explaining that, "[f]or a subsequent agreement to constitute a rescission, it must be made with the *mutual* consent of the parties to the original contract") (emphasis in original); *see* RESTATEMENT (SECOND) CONTRACTS § 283.[2] Section 283 of the Restatement provides:

---

1. Noting that Great American had claimed the right to avoid any obligation under its surety contract with General Builders "simply because it had the power to cancel the bonds, rather than the right to cancel the contract in response to a material breach by General Builders," the Nevada Supreme Court concluded that Great American had not properly pleaded rescission as a defense. *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 934 P.2d 257, 262–63 (1997).

2. Nevada, like Texas, generally follows the Restatement (Second) of Contracts. *See, e.g.*, *Zhang v. Eighth Judicial Dist. Court of State ex rel. County of Clark*, 120 Nev. 1037, 103 P.3d 20, 23–24 (2004) (agreeing with Restatement (Second) of Contracts and Professor Corbin's rejection of "the notion that rescission of a contract that is executory on both sides supplies consideration for a *simultaneous* new agreement" (emphasis in original)); *NOLM, LLC v. County of Clark*, 120 Nev. 736, 100 P.3d 658 (2004); *Traffic Control Servs., Inc. v. United Rentals Nw., Inc.*, 120 Nev. 168, 87 P.3d 1054 (2004).

(1) An agreement of rescission is an agreement under which each party agrees to discharge all of the other party's remaining duties of performance under an existing contract.

(2) An agreement of rescission discharges all remaining duties of performance of both parties. It is a question of interpretation whether the parties also agree to make restitution with respect to the performance that has been rendered.

RESTATEMENT (SECOND) CONTRACTS § 283. The Restatement further explains that "[c]onsideration is provided by each party's discharge of the duties of the other. This is so even though one or both parties have partly performed their duties or one or both have a claim for damages for partial breach." *Id.* at cmt. a.

■ As with any binding agreement, the evidence must objectively manifest an agreement to rescind. Our Texas Supreme Court in *Texas Gas Utilities Co. v. Barrett*, like the Nevada high court in *Bergstrom*, relies on the rule of rescission as defined by Professor Corbin in observing that:

> parties may rescind their contract by mutual agreement and thereby discharge themselves from their respective duties. The mutual release of the rights of the parties is regarded as a sufficient consideration for the agreement.... [E]xpressions of assent are usually in the form of an offer by one and an acceptance by the other and an operating agreement of rescission can be made tacitly as well as expressly.

460 S.W.2d 409, 414 (Tex.1970) (citing ARTHUR LINTON CORBIN, 5A CORBIN ON CONTRACTS § 1236, at 542 (1964)); *see Bergstrom*, 854 P.2d at 861.

*Effect of the jury's finding*

The question submitted to the jury did not ask whether Nevada Gold and American Heritage mutually agreed to rescind the contract. American Heritage contends that the finding that it returned to Nevada Gold everything of value received under the contract required the trial court to conclude as a matter of law that the contract was rescinded. Based on our understanding of Nevada law, we disagree with American Heritage's contention that the question as submitted sufficed to submit the issue of rescission to the jury.

The question tendered by American Heritage and submitted to the jury tracks language from *Bergstrom*, which views rescission as an equitable remedy. *See* 854 P.2d at 861; *see also Awada v. Shuffle Master, Inc.,* — Nev. —, 173 P.3d 707, 712–13 (2007) (concluding that trial court did not abuse its discretion by rescinding parties' agreement because substantial evidence supported finding of fraud in inducement). For purposes of our analysis, therefore, we interpret American Heritage's request as one for equitable relief.

Under Texas procedure, the jury may decide ultimate issues of fact, but the trial court ultimately decides whether equitable relief is appropriate. *See Indian Beach Property Owners' Ass'n v. Linden,* 222 S.W.3d 682, 690 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Its decision to grant or deny equitable relief is a matter of discretion, subject to reversal only on a showing of abuse. *See id.* at 690–91. "An abuse of discretion occurs if the trial court (1) acts arbitrarily and unreasonably, without reference to guiding rules or principles, or (2) misapplies the law to the established facts of the case." *Id.* at 691.

Here, the trial court did not abuse its discretion in declining to grant American Heritage's request for equitable rescission. First, as the trial court observed, the question answered by the jury does not provide a sufficient factual basis to award rescission under Nevada law because it does not inquire whether the parties mutually consented to forego their rights under the

contract.[3] *See Great Am. Ins. Co.,* 113 Nev. at 354, 934 P.2d at 262. American Heritage did not point either the trial court or this court to any Nevada authority recognizing an equitable claim for rescission on behalf of a defendant under comparable circumstances.

Second, the record does not contain legally sufficient evidence that Nevada Gold, either explicitly or implicitly, agreed to discharge American Heritage's remaining duties under the agreement when it demanded satisfaction of the promissory note, and the jury made no such finding. In pointing to Nevada Gold's demand for return of the promissory note in isolation, American Heritage overlooks the fact that Nevada Gold already had instituted an arbitration proceeding seeking benefit of the bargain damages before it made the demand.[4] There is no evidence that Nevada Gold offered to dismiss the arbitration proceeding or agreed not to pursue this civil action if American Heritage returned the funds. To the contrary, given Nevada Gold's unflagging persistence in pursuing its legal remedies to hold American Heritage accountable for breaching its obligations under the contract, a reasonable juror could not find that Nevada Gold agreed to abandon its rights under the contract in exchange for payment of the promissory note, even had the jury been asked to decide the matter.

Instead, Nevada Gold's demand for return of the funds is reasonably construed as an effort to mitigate its damages. Pertinent to American Heritage's challenge, Professor Corbin, an authority that the Nevada Supreme Court relied on in *Bergstrom,* has noted the difference between rescission and mitigation in an earlier edition of his treatise:

> When one party repudiates the contract, that repudiation discharges the other party from any further duty to perform under the contract. That party may try to avoid or reduce injury by contracting elsewhere for substitute material or service, demanding his money back or the reconveyance of his property.... In doing these things, he is trying to avoid harms and losses; he is not offering a "rescission," or "waiving" his rights or "electing" a remedy. These are things that the injured party can do, but they are clearly distinguishable.

CORBIN ON CONTRACTS § 1237 (1 vol. ed.1952). The Texas Supreme Court's reasoning in *Barrett* endorses the same distinction. In that case, the petitioner gas company sued a former lessee of a farm for breach of contract based on his failure to make payments. The respondent lessee contended that the gas company rescinded the contract by continuing to provide gas to the property but billing the property owner-lessor for the service. The Court disagreed, reasoning that:

> the act of petitioner in billing the owner-lessor Thompson for gas subsequently delivered to the farm, and the success of petitioner in replacing the repudiated contract with later ones of similar import, all payments under which have been credited to respondents for the period in question, is not conduct indicative of assent to a rescission. It was the

3. American Heritage attempts to uphold its attempt to obtain a rescission finding by invoking Rule 279 of the Texas Rules of Appellate Procedure in its reply brief, but that rule has no application here. *See* TEX.R. CIV. P. 279 (providing that, under specified circumstances, trial court *may* make findings on omitted elements *in support of the judgment*) (emphasis added).

4. This fact appears throughout the record—in Nevada Gold's pleadings, motion in limine, and its Combined Motion to Disregard Jury Finding and Motion for Judgment on the Verdict. Also, a copy of the September 27, 2002 arbitration demand is attached to Nevada Gold's Combined Motion.

duty of petitioner to mitigate its losses and its doing so was favorable to respondents.

*Barrett,* 460 S.W.2d at 415.

Here, because American Heritage repudiated the contract, Nevada Gold was entitled to mitigate its damages. In fact, it had the burden to do so. *See Conner v. So. Nev. Paving,* 103 Nev. 353, 741 P.2d 800, 801 (1987) (stating that, "[a]s a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts"), *quoted in Sheehan & Sheehan v. Nelson Malley Co.,* 121 Nev. 481, 117 P.3d 219, 226 (2005). Given that American Heritage had already repudiated the contract by informing Nevada Gold it could no longer participate, Nevada Gold had no reason or obligation to act as if American Heritage would use the funds to Nevada Gold's benefit in furtherance of the contract. *See Schwartz v. Wasserburger,* 117 Nev. 703, 30 P.3d 1114, 1116 n. 5 (2001) (observing that "when one party engages in anticipatory breach, the other party may treat the contract as ended and sue immediately").

In summary, American Heritage's reliance on *Bergstrom* and the jury's finding to contend that the trial court abused its discretion in failing to rescind the agreement pursuant to its equitable power is misplaced. Rather, as the Nevada Supreme Court noted in *Bates,* rescission requires mutual consent. Although an aggrieved party to a contract may seek equitable rescission as a remedy, like the party in *Bergstrom,* we conclude that a breaching party must show mutual agreement to rescind before relying on equitable rescission to foreclose a non-breaching party's remedies at law. Accordingly, we conclude that the trial court did not err in disregarding the jury's finding or abuse its discretion in declining to uphold Nevada Gold's rescission defense.

*Election of remedies*

■ American Heritage also claims that, by demanding return of the promissory note, Nevada Gold made an irrevocable election of remedies and, once American Heritage complied with that demand, Nevada Gold could not recover under the benefit of the bargain measure of damages found by the jury and awarded in the judgment. This claim does not comport with Nevada law concerning the election of remedies. *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.,* 120 Nev. 277, 89 P.3d 1009, 1017 & n. 16 (2004) (holding that plaintiff is not required to elect between theories of recovery before obtaining jury verdict because trial court can determine whether judgment on verdict would result in duplicate recovery). Nevada has endorsed the Restatement's rule that, "[i]f a party has more than one remedy ..., his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation." RESTATEMENT (SECOND) CONTRACTS § 378, *cited in Mackintosh v. Cal. Fed. Sav. & Loan Ass'n,* 113 Nev. 393, 404, 935 P.2d 1154, 1161 (Nev.1997). The Restatement explains that a change of position is "material" only when all of the circumstances indicate that a shift in remedies would be unjust. RESTATEMENT (SECOND) CONTRACTS § 378 cmt. a. American Heritage has neither alleged nor proved such a change of position here.[5]

5. We do not suggest that an aggrieved party can obtain a double recovery by foregoing its election of remedies until judgment. Here, Nevada Gold accounted for the cash expenditure in connection with calculating its contractual profit. American Heritage does not contend that Nevada Gold receives a double recovery, but instead argues that Nevada Gold completely eliminated its right to benefit

## IV. Damages

Next, American Heritage contends that the trial court erred in entering judgment on the jury's finding of damages because Nevada Gold did not provide competent evidence to support the award. Specifically, American Heritage urges that the judgment should be reversed because the jury's damages award (1) does not follow the proper measure of damages in the court's charge; (2) is not supported by proper expert testimony; and (3) includes speculative damages. After discussing Nevada Gold's damages evidence, we address each contention in turn.

### A. *Nevada Gold's evidence of damages*

At trial, Nevada Gold put on evidence of its damages through its former chief financial officer, Christopher Domijan. Domijan testified that while employed at Nevada Gold, he was responsible for its financings and keeping financial records. To arrive at a net lost profits figure, Domijan used American Heritage's financial reports from the casino project. Domijan also relied on his recollection of the parties' discussions relating to projected expenses, and Nevada Gold's overhead expenses saved because it did not participate in the project. American Heritage's financial documents reported the revenues it actually earned and the expenses it actually charged to the casino project after it went forward without Nevada Gold. Domijan accepted these revenues figures, but identified certain expenses American Heritage had charged to the project that he testified should not have been charged. Overall, Nevada Gold would not have approved approximately $1.6 million of the total expenses American Heritage charged to the project. On the other hand, Domijan also adjusted the expense figure upward to include the 30% of the cost of overhead previously incurred by American Heritage that the parties had agreed to charge back to the project, and accounted for the 50% of the expenses charged to the project which Nevada Gold had agreed to pay.

Domijan further testified that Nevada Gold was to have taken over the accounting books for the joint venture and would have had some nominal accounting and travel expenses to split with American Heritage. Domijan reduced the actual profits by Nevada Gold's capital contributions and adjusted the expenses to reflect the same amount, thus leaving a net profit. On cross-examination, Domijan conceded that he did not deduct any amount for state or federal taxes because profits would have been distributed through the LLC on a pre-tax basis.

In addition to American Heritage's net profits from operating the casino, Domijan considered American Heritage's eventual sale of the project to the tribe. Ultimately, Domijan testified that the casino project yielded a net profit of $17.5 million to American Heritage, of which fifty percent, or $8.75 million, constituted net profits Nevada Gold lost as a result of American Heritage's breach.

### B. *Benefit of the bargain*

American Heritage first contends that the damages awarded do not follow the measure of damages submitted in the court's charge. The charge asked the jury to find the "sum of money, if any, if paid now in cash, [that] would fairly and reasonably compensate Nevada Gold for its damages, if any, that resulted from American Heritage's failure to comply" with the contract. It further instructed the jury that "Nevada Gold is entitled to all sums which Nevada Gold would have received had American Heritage complied" with the contract.

of the bargain damages when it sought, and received, a return of its cash expenditure.

"[I]n a breach-of-contract case, the normal measure of damages is just compensation for the loss or damage actually sustained, commonly referred to as the benefit of the bargain," which may include reasonably certain lost profits. *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex.App.-Houston [1st Dist.] 2006, no pet.). The question submitted to the jury, which tracks the Texas pattern jury charge question on contract damages,[6] is an accurate statement of law, but does not constrain the jury to decide the amount of damages under any particular formula.

American Heritage did not object to the damages submission, but nevertheless cites to the operating contract language as providing the only proper measure of damages. In particular, American Heritage relies on provisions that declare that it and Nevada Gold were to distribute cash flow from operations at their discretion, and would reimburse each other through the LLC only for related expenses that they both approved. Domijan's testimony is consistent with these provisions.

American Heritage asserts that, because of managerial discretion and the need for joint approval, Domijan could not have relied on personal knowledge in testifying about distributions made and expenses approved, making his testimony necessarily speculative. We understand American Heritage's argument to be that the evidence is legally insufficient to support the jury's damages finding because those damages allegedly contained lost profits that were not sufficiently proved, and address it accordingly. *See Bowen*, 227 S.W.3d at 95.

### 1. *Evidentiary standard for proof of lost profits*

When a plaintiff is prevented from performing a contract, "lost profits are generally an appropriate measure of damages so long as the evidence provides a basis for determining, with reasonable certainty, what the profits would have been had the contract not been breached." *Eaton v. J. H., Inc.*, 94 Nev. 446, 581 P.2d 14, 17 (1978). The "party seeking damages has the burden of providing the court with an evidentiary basis upon which it may properly determine the amount of damages." *Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 351, 360 (2000) (citing *Mort Wallin v. Comm'l Cabinet*, 105 Nev. 855, 784 P.2d 954, 955 (1989)). Damages need not, however, "be proven with mathematical exactitude, and [ ] the mere fact that some uncertainty exists as to the actual amount of damages sustained will not preclude recovery." *Id.*

■ Generally, a plaintiff may recover lost profits if it can show a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *See, e.g., Eaton*, 581 P.2d at 17. The mere fact that the breached agreement contemplated a new business with no prior history of profits, however, does not bar recovery under a lost profits measure as too speculative, uncertain, or remote. "The rule barring recovery of uncertain lost profits is directed against 'uncertainty as to the existence of (profits) rather than as to measure or extent.'" *Gen. Elec. Supply Co. v. Mt. Wheeler Power, Inc.*, 94 Nev. 766, 587 P.2d 1312, 1313 (1978) (quoting *Fireman's Fund Ins. v. Shawcross*, 84 Nev. 446, 442 P.2d 907, 912 (1968)).

### 2. *Domijan's testimony*

■ American Heritage's challenge, in part, concerns whether Domijan could provide competent testimony concerning the reasonableness of expenses. American Heritage posits that Nevada Gold could

**6.** *See* Texas Pattern Jury Charges PJC 110.2 (2006 ed.).

not prove its damages through Domijan because he lacked personal knowledge concerning what had transpired in the casino project as reflected in American Heritage's financial documents, and also lacked specialized knowledge concerning what would have been appropriate expenditures under the contract.

Under Rule 701 of the Texas Rules of Evidence, a lay witness may testify to opinions or inferences rationally based on that witness's perception and helpful to a clear understanding of the witness's testimony or the determination of a fact issue. TEX.R. EVID. 701. Pertinent to this case, Texas courts regularly allow business owners or officers to testify as lay witnesses, based on knowledge derived from their position, about what they had reasonably anticipated from the business activities they were prevented from undertaking as a result of another party's breach. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 131–32 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692 (Tex.2000); *Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 352 (Tex.App.-Fort Worth 1996, no writ).[7] "A new business owner's opinion of its lost profits may have probative value even though the estimate is based on knowledge of a previous similar business and the underlying business records are not introduced." *Ishin Speed Sport, Inc.*, 933 S.W.2d at 352.

Domijan based his calculations and conclusions on the actual revenues American Heritage received after cutting Nevada Gold from the project, and the expenses that he, as the financial representative for

Nevada Gold, would have accepted as reasonable under the contract. Domijan testified that, as Nevada Gold's CFO, he had previous experience securing financing for the gaming industry and was authorized to make financial decisions for the company. Based on personal knowledge derived from this experience, Domijan provided admissible testimony about the amount of net profits Nevada Gold could have reasonably anticipated. Domijan's business experience with Nevada Gold equipped him to conclude that, but for American Heritage's breach, Nevada Gold could have reasonably anticipated receiving approximately half of the net profits actually earned by the casino project, as the operating contract provides. *See Jeaness v. Besnilian*, 101 Nev. 536, 706 P.2d 143, 146 (1985) (finding excluded partner entitled to recover half of net profits realized by partner running business as sole owner after breaching partnership agreement). The fact that Domijan could not have personal knowledge concerning the admitted, actual revenues because Nevada Gold did not participate in the project did not prevent him from using American Heritage's financial data as a basis for determining Nevada Gold's lost profits.

Furthermore, the fact that Domijan used American Heritage's financial statements as a basis for calculating Nevada Gold's reasonably anticipated lost profits did not require him to wholesale adopt the expenses documented by those financial statements. For example, Domijan deducted the expenses incurred by American Heritage in connection with this litigation, opining that Nevada Gold would not have agreed to charge them to the project. This opinion is consistent with the con-

---

**7.** American Heritage relies on Texas law in challenging the competence and admissibility of Domijan's testimony, and Nevada Gold does not identify any material difference between Texas law and Nevada law on these

issues. Accordingly, for purposes of this analysis, we presume that Nevada law and Texas law are the same. *See Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex.2006).

tract's indemnification provision, which requires each member to "indemnify the Company, each Manager, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach of that Member of this Agreement." Based on his personal knowledge and experience handling financial affairs for Nevada Gold, Domijan could provide admissible testimony concerning expenses that Nevada Gold would have accepted or rejected. American Heritage was free to challenge the reasonableness of Domijan's conclusions on cross-examination. Disputes about particular parts of expenses, and whether or not they reasonably should be charged against the project, are matters affecting the weight and credibility of the testimony, not its overall admissibility. *See Holt Atherton Indus. Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Texaco, Inc. v. Phan,* 137 S.W.3d 763, 771 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

American Heritage also complains that, because the contract expressly confers the authority to approve expenses on H. Thomas Winn, Nevada Gold's CEO, the jury could not have found that Winn would have delegated that responsibility to Domijan. We disagree. Domijan testified that he would have been responsible for reviewing and approving expenses to be charged to the project. This evidence permitted the jury to reasonably find that Winn would have appointed CFO Domijan as his agent to exercise the authority to approve or reject expenses on behalf of Nevada Gold.

American Heritage further asserts that Nevada Gold's evidence of lost profits resulting from the sale of the casino project is speculative because Domijan testified that Nevada Gold would not have agreed to the buyout. This testimony appears in the plaintiff's bill of exception and, thus, the jury did not hear it. *See Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 577 (Tex.2006) (explaining that "[t]he purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record, such as evidence that was excluded," and holding that court of appeals could not consider testimony from bill of exceptions without having first determined, pursuant to properly assigned error, that trial court erred in refusing to admit testimony). Because the trial court did not admit the testimony, no error could have resulted from it.

Under the circumstances presented, Domijan's testimony did not overstep the line separating reasonably anticipated lost profits from impermissible speculation. We therefore hold that, under Nevada law, legally sufficient evidence supports the jury's contract damages finding in favor of Nevada Gold.

## V.  Prejudgment interest

■   American Heritage next contends that the trial court erred in awarding prejudgment interest to Nevada Gold. Nevada law generally provides that, absent a contractual provision fixing a different rate of interest, "interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada ... on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due...." Nev.Rev.Stat. § 99.040(1).  In a contract case,

> [t]he amount of money to which the interest rate will be applied must be determined by the following factors: (1) if the contract breached provides for a definite sum of money, that sum; (2) if the performance called for in the contract, the value of which is stated in money or is ascertainable by mathemati-

cal calculation from a standard fixed in the contract or from established market prices of the subject matter, that sum. *Paradise Homes, Inc. v. Cent. Sur. & Ins. Corp.*, 84 Nev. 109, 437 P.2d 78, 83 (1968). Accordingly, the propriety of an award of prejudgment interest depends on whether a definite amount is stated, can be ascertained from information contained within the four corners of the contract, or can be calculated through possible reference to an established market price. Comparing the contract in this case with other Nevada cases, we do not find any of these characteristics present. *See Hornwood v. Smith's Food King No. 1*, 107 Nev. 80, 807 P.2d 208, 214 (1991); *Jeaness*, 706 P.2d at 147. Although the contract contains information for allocation of profits, it does not direct calculation of any sum certain, either standing alone or by reference to any market price.[8] Moreover, the contract does not identify any date that would serve for commencing the running of interest, and no figure was available until the jury awarded damages. In such circumstances, Nevada law does not allow recovery for prejudgment interest. *See Hornwood*, 807 P.2d at 214; *Jeaness*, 706 P.2d at 147.

## VI. Nevada Gold's appeal on alter ego

■ In its sole issue on appeal, Nevada Gold challenges the trial court's ruling granting Gillman's j.n.o.v., disregarding the jury's finding that Gillman is individually liable for American Heritage's conduct. Specifically, Nevada Gold contends that legally sufficient evidence supports the jury's finding of legal unity between Gillman and American Heritage, and that Gillman used American Heritage to perpetrate a fraud on Nevada Gold for his personal benefit.

The charge instructed the jury that Gillman was responsible for American Heritage's conduct if:

American Heritage was organized and operated as a mere tool or business conduit of Fred Gillman; there was such unity between American Heritage and Fred Gillman that the separateness of American Heritage had ceased and holding only American Heritage responsible would result in injustice; and Fred Gillman caused American Heritage to be used for the purpose of perpetuating [sic] and did perpetuate [sic] an actual fraud on Nevada Gold primarily for the direct personal benefit of Fred Gillman.

With respect to the unity element, the charge further instructed the jury to consider the total dealings of American Heritage and Fred Gillman, including:

1. The degree to which American Heritage's property had been kept separate from that of Fred Gillman;

2. The amount of financial interest, ownership, and control Fred Gillman maintained over American Heritage; and

3. Whether American Heritage had been used for the personal purposes of Fred Gillman.[9]

---

8. We decline Nevada Gold's invitation to construe this reference to an "established market price" as allowing for reference to American Heritage's books and records.

9. The parties make much of whether Texas or Nevada law applies to this alter ego finding, but, for purposes of this case, we do not discern a meaningful difference between the laws of the two states concerning the unity element of the alter ego doctrine. *Compare Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598,

747 P.2d 884, 886 (1987) (holding that for alter ego to exist, corporation must be influenced and governed by person asserted to be alter ego, there must be such unity of interest and ownership that one is inseparable from other, and facts must be such that adherence to corporate fiction of separate entity would, under circumstances, sanction fraud or promote injustice) *with Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990) (stating that "under the alter ego theory, courts disregard the corporate entity when there exists

(*Id.*) Thus, we analyze whether the evidence of these three factors presented at trial "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

In determining whether a unity between corporation and individual exists, Texas courts consider the totality of the circumstances, including:

(1) payment of alleged corporate debts with personal checks or other commingling of funds,

(2) representations that the individual will financially back the corporation,

(3) diversion of company profits for the individual's personal use,

(4) inadequate capitalization, and

(5) other failures to keep corporate and personal assets separate.

*Country Village Homes, Inc. v. Patterson,* 236 S.W.3d 413, 428 (Tex.App.-Houston [1st Dist.] 2007, pet. filed). In asserting that Gillman and American Heritage had such unity that the separateness of American Heritage had ceased, Nevada Gold directs us to the following evidence:

- Gillman identified himself as "the owner and the boss" of American Heritage;

- Gillman testified that, because American Heritage is a subchapter S corporation, "everything flows through" American Heritage to him;

- American Heritage does business as "The Gillman Group";

- Gillman personally guaranteed one loan and provided another to American Heritage;

- Nevada Gold issued stock purchase warrants to Gillman individually;

- American Heritage paid insurance for luxury cars owned by Gillman.

We agree with the trial court that these facts do not amount to more than a scintilla of evidence to support a finding of unity. Concerning Gillman's role as CEO and sole shareholder, "[a] showing that an individual is an officer, director, or majority shareholder is insufficient to support a finding of [a]lter [e]go." *Country Village Homes, Inc.,* 236 S.W.3d at 428. Nor do we find his description of the S corporation's function sufficient to support a finding of unity. Although personal loans to a corporation may support a finding of unity, courts typically cite to this factor in conjunction with proof of inadequate capitalization, which is not present here. *See, e.g., id.* at 436 (holding that evidence was legally and factually sufficient evidence to support finding that corporation was used to perpetrate actual fraud for personal benefit of individual defendant where most or all of corporate assets had been transferred to another company belonging to individual defendant, individual defendant would pay for personal items such as utility bills and car payments out of companies' accounts); *Sparks v. Booth,* 232 S.W.3d 853, 869 (Tex.App.-Dallas 2007, no pet.) (holding that evidence was legally sufficient to support trial court's implied finding of alter ego where individual testified he was president, secretary, sole shareholder, and sole director of bankrupt corporation, personally rented office building to corporation, and that corporation had no assets because it was subchapter S corporation so all benefits and detriments flowed to him); *Hoffmann v. Dandurand,* 180 S.W.3d 340, 350–51 (Tex.App.-Dallas 2005, no pet.) (concluding that evidence that defendant was principal, if not sole, shareholder of company did not support piercing corporate veil where no evidence supported allegation that he stripped corporation of its assets).

such unity between corporation and individual that the corporation ceases to be separate and when holding only the corporation liable would promote injustice.'').

We disagree that the stock purchase warrants that Nevada Gold issued in Gillman's name constitute any evidence to support a finding of unity. Nothing in the record suggests the purpose of the warrants was not a practice undertaken in the ordinary course of business—in other words, that the company wrongfully issued them or that the issuance of warrants to the CEO destroys corporate formalities. The only evidence explaining American Heritage's payment of insurance for luxury cars shows that American Heritage used the cars to transport high roller gamblers and tribal leaders in connection with the casino business. Neither of these facts supports a reasonable inference that Gillman commingled corporate and personal assets or wrongfully diverted corporate assets for his personal use.

We hold that the trial court properly granted j.n.o.v. on this issue because no evidence would allow a reasonable jury to find that holding only American Heritage responsible would result in injustice. Here, no facts show, for example, that American Heritage was undercapitalized, that Gillman commingled personal and corporate assets to the corporation's detriment, or that Gillman led Nevada Gold to believe it was dealing with him personally and used American Heritage as a shield from personal liability. *See Hoffman,* 180 S.W.3d at 350–51. Accordingly, under the totality of the circumstances, we agree with the trial court that the evidence is legally insufficient to support a finding that observing the corporate form would lead to injustice.

### Conclusion

We hold that Nevada Gold has standing and that the trial court properly entered judgment for liability and damages on its breach of contract claim against American Heritage. We further hold that the trial court properly concluded that Gillman is not individually liable for American Heri-

tage's damages under an alter ego theory. Finally, we conclude that Nevada law does not allow for prejudgment interest on this contract claim. We therefore modify the judgment to delete the award of prejudgment interest and as modified, affirm.